**UNITED STATES of America, Appellee,**

v.

**Ralph Clayton ROBINSON, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Jumenia WATTS, Appellant.**

Nos. 82–5188(L), 82–5193.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 10, 1982.
Decided May 17, 1983.

James H. Carson, Jr., Charlotte, N.C. (Keith M. Stroud, Charlotte, N.C., on brief), for appellants.

Richard S. Gordon, Asst. U.S. Atty. (Charles R. Brewer, U.S. Atty., Asheville, N.C., on brief), for appellee.

Before PHILLIPS, SPROUSE and ERVIN, Circuit Judges.

SPROUSE, Circuit Judge:

Ralph Clayton Robinson and Jumenia Watts appeal from their jury convictions for possessing and distributing controlled substances in violation of 21 U.S.C. § 841(a)(1), and conspiring to distribute controlled substances in violation of 21 U.S.C. § 846. Robinson, who is the owner of the involved pharmacy, also appeals his conviction for violating the recordkeeping requirements of 21 U.S.C. §§ 827(a)(3) and 843(a)(4)(A). Robinson contends that the district court erred in admitting hearsay evidence against him, and in admitting evidence of a telephone identification of his voice. He also contends that the recordkeeping requirements do not apply to him because he is not a pharmacist. Watts contends that a warrant obtained to search a package which she had mailed was obtained without probable cause. We disagree with all these contentions and affirm.

At the time of the events in question, defendant Robinson owned and managed the Hoskins Drug Store in Charlotte, North Carolina. Although Robinson operated the store, he is not a pharmacist. Defendant Watts is a resident of Charlotte. Mrs. Johnnie Mae Gaddy, an unindicted coconspirator of Robinson and Watts, testified for the government against the two. Gaddy was serving a prison sentence at the time of the trial of Robinson and Watts for distributing Talwin and Tripelennamine, commonly known as "T and Blues."[1] She began selling the two drugs in Indianapolis in June, 1981, but moved to Charlotte in September, 1981.

The investigation leading to the arrests of Gaddy, Robinson, Watts and others began on September 15, 1981, when Delta Airlines' employees informed officer Harkey of the Charlotte Vice and Narcotics squad of a suspicious looking package at the company's air freight terminal. Harkey took a trained narcotics detection dog, "Ca-

---

1. Talwin (Pentazocine Hydrochloride) is a Schedule IV controlled substance, as defined in 21 U.S.C. § 812. Tripelennamine is a non-controlled substance. The two drugs are sold in the illicit narcotics trade as a pair and are known as "T and Blues." "T" refers to Talwin and "Blues" refers to Tripelennamine. The testimony reflects that one practice of addicts is to crush them together in a spoon, mix with a liquid and, after cooking the mixture, inject it.

jun," to the terminal and was met there by another officer. The dog, working alone among the packages stored there, eventually bit into a package and brought it to Harkey. Harkey and his partner obtained a search warrant and opened the package. It contained quantities of Talwin and Tripelennamine. A week later, Harkey returned to the airport to investigate a similar tip. The second suspicious package was wrapped similar to the first, but "Cajun" did not detect it.[2] After obtaining a search warrant, Harkey opened the package and found bottles of Talwin and Tripelennamine. The two packages were identically wrapped and addressed to a Neil Cowherd[3] in Indianapolis from Johnnie Mae Gaddy in Charlotte.

Johnnie Mae Gaddy testified that while living in Indianapolis with her husband, George,[4] she received shipments of "T and Blues" mailed by Watts from Charlotte. Gaddy would then telephone Watts verifying receipt of the pills. Gaddy also kept records showing the amount received and sold. She and her husband kept a portion of the proceeds and gave the balance to Watts. Receipts for the shipments were identified by Gaddy, one of which bore the name "Jumenia Watts, Hoskins Company." In July, 1981, Gaddy visited Watts in Charlotte, where Watts gave her Talwin and Tripelennamine to send to Indianapolis. After her move to Charlotte in September, 1981, Gaddy went to the Hoskins Drug Store and witnessed Watts give Robinson $880.00 and receive a bottle of Tripelennamine.

Gaddy also testified that while living in Indianapolis she received collect telephone calls from Watts concerning details of the drug shipments. On occasion, Robinson would interrupt these telephone conversations and ask Gaddy if he could speak to her husband. After one such conversation, George Gaddy told Mrs. Gaddy that "Robinson wouldn't send the pills unless we sent

the other part of the money" and subsequently that "he changed his mind and said he would sent the pills." At that time, Mrs. Gaddy had never met Robinson, but she testified that she recognized his voice from a previous telephone conversation and confirmed her recognition of his voice from subsequent conversations.

■ Robinson first contends that the district court committed reversible error in admitting hearsay statements of coconspirator Watts and alleged coconspirator George Gaddy. Specifically, Robinson argues that the district court erred in admitting Mrs. Gaddy's testimony of the telephone statements of Watts concerning the drug shipments from Charlotte, and in permitting Gaddy to relate her husband's restatement of the incriminating remarks made by Robinson during one of the telephone conversations. The government contends, however, that these statements were not hearsay under the definition of Federal Rule of Evidence 801(d)(2)(E). This rule provides that "[a] statement is not hearsay if ... (2) [t]he statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Declarations cannot be introduced under this evidentiary rule unless the conspiracy is proven by a preponderance of evidence independent of the declarations. *United States v. Stroupe,* 538 F.2d 1063, 1065 (4th Cir.1976); *United States v. Jones,* 542 F.2d 186, 203 (4th Cir.1976).

■ In this case, there was adequate evidence to establish independently the existence of a conspiracy and Robinson's participation in it. There was direct evidence of Watts' and Gaddy's involvement in the conspiracy, and that the narcotics were shipped from Charlotte to Indianapolis. The evidence also shows that Gaddy retained some

---

**2.** It developed at trial that "Cajun" was not trained to detect either Talwin or Tripelennamine, but would "alert" to packages that had been handled by individuals who had been handling marijuana, cocaine, or heroin.

**3.** Neil Cowherd was an unindicted coconspirator of Robinson and Watts. He is not otherwise involved in this appeal.

**4.** George Gaddy did not appear at trial and the reason for his absence is not explained.

of the receipts for the shipments which bore Watts' name; that Gaddy witnessed Robinson transfer a bottle of "Blues" to Watts and receive $880.00; and that apart from the content of Robinson's telephone conversation, there was direct evidence that Robinson took part in two telephone conversations from Watts' home in Charlotte to the Gaddys' apartment in Indianapolis. In view of this evidence, the district court acted properly in admitting the disputed testimony of Mrs. Gaddy.

■ Robinson next contends that the district court improperly allowed Mrs. Gaddy to testify that she had identified his voice during these telephone conversations. This contention must also fail. Federal Rule of Evidence 901(b)(5) governs the admission of voice identification into evidence. It provides generally that voice identification may be made by one who has heard the voice "at any time under circumstances connecting it with the alleged speaker." Circumstantial evidence may be considered for this purpose, *United States v. Espinoza,* 641 F.2d 153 (4th Cir.1981); *United States v. Carrion,* 463 F.2d 704 (9th Cir.1972); *United States v. Alper,* 449 F.2d 1223 (3d Cir.1971), and the identification may be based upon knowledge which the witness obtained before or after the conversation in question. *See United States v. Vitale,* 549 F.2d 71 (8th Cir.), *cert. denied,* 431 U.S. 907, 97 S.Ct. 1704, 52 L.Ed.2d 393 (1977). All that is required is that the witness have the requisite familiarity with the speaker's voice. *United States v. Thomas,* 586 F.2d 123 (9th Cir.1978).

■ In the present case, Jumenia Watts initially placed the telephone calls to Mrs. Gaddy. Gaddy knew Watts personally and the telephone calls were corroborated by telephone records. Gaddy heard the voice she identified as Robinson during two of the calls which she received from Watts. On one of these occasions, the speaker identified himself as Ralph—Robinson's first name. Additionally, after moving to Charlotte, Gaddy telephoned Robinson's pharmacy and talked with a man whose voice she identified as Robinson's. She stated that it

was the same voice she had heard during the calls she received in Indianapolis. Finally, Gaddy accompanied Watts to the Hoskins Drug Store where she talked directly with Robinson. This evidence laid the requisite foundation of Gaddy's familiarity with Robinson's voice. The admission of her testimony identifying Robinson's voice was therefore proper.

■ Finally, Robinson contends that he was improperly convicted of violating the recordkeeping requirements of 21 U.S.C. §§ 827(a)(3) and 843(a)(4)(A). He argues that he is not subject to these provisions because he is not a pharmacist. Section 827(a)(3) provides:

[O]n and after May 1, 1971, every registrant under [subchapter I of the Controlled Substances Act] manufacturing, distributing, or dispensing a controlled substance or substances shall maintain, on a current basis, a complete and accurate record of each such substance manufactured, received, sold, delivered, or otherwise disposed of by him, except that this paragraph shall not require the maintenance of a perpetual inventory.

This section does not suggest that Congress intended to hold only pharmacists accountable for the recordkeeping provisions relating to controlled substances. It requires that every "registrant" maintain the appropriate records. 21 U.S.C. § 823(f) provides that pharmacies engaged in commercial activities "shall be registered to dispense controlled substances . . . if they are authorized to dispense under the law of the State in which they regularly conduct business." Additionally, a "registrant" may be a manufacturer, distributor or dispenser of a controlled substance. A "dispenser" is defined under the statute as including a pharmacy which is authorized to deliver a controlled substance to an ultimate user or research subject. 21 U.S.C. § 802(10), (20). In the present case, Robinson was the sole owner of Hoskins Drug Store and had filed an application with the Drug Enforcement Administration for renewal of the store's registration to handle controlled substances. In the application for renewal, Robinson

stated that the store was authorized to dispense controlled substances under North Carolina law. Thus, although there are no reported cases defining "registrant," the plain language of the statute shows a Congressional intent to hold the owner of a drug store accountable under the circumstances present in this case.

 The only contention advanced by Watts on appeal is that the narcotics detection dog, "Cajun," while trained to detect marijuana and cocaine, was not trained to detect Talwin or Tripelennamine. She argues that since the dog was not trained to detect these specific substances, probable cause was not established when the dog "alerted" the package which she had mailed. There is no merit to this argument. The detection of narcotics by a trained dog is generally sufficient to establish probable cause. *See United States v. Sullivan,* 625 F.2d 9 (4th Cir.1980); *United States v. Waltzer,* 682 F.2d 370 (2d Cir.1982). Although "Cajun" was trained to detect other narcotics, he was also trained to "alert" to packages which had been in the possession of individuals who had handled marijuana, cocaine, or heroin. His initial detection, therefore, was sufficient to establish probable cause for a search for controlled substances—the fact that a different controlled substance was actually discovered does not vitiate the legality of the search. *United States v. Johnson,* 660 F.2d 21 (2d Cir.1981); *United States v. Viera,* 644 F.2d 509 (5th Cir.), *cert. denied,* 454 U.S. 867, 102 S.Ct. 332, 70 L.Ed.2d 169 (1981).

Based on the foregoing discussion, the judgment of the district court is affirmed.

AFFIRMED.