Charles CLIFFORD, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

97–SC–368–MR.

Supreme Court of Kentucky.

Nov. 18, 1999.

Rehearing Denied Jan. 20, 2000.

Brenda Popplewell, Somerset, for Appellant.

A.B. Chandler, III, Attorney General, State Capitol, Frankfort, Courtney A. Jones, Assistant Attorney General, Frankfort, for Appellee.

Opinion of the court by Justice COOPER.

Following a jury trial in the Campbell Circuit Court, Appellant was convicted of one count of trafficking in a controlled substance in the first-degree. He then entered a guilty plea to being a persistent felony offender in the first-degree and waived jury sentencing. He was sentenced to ten years in prison for the trafficking conviction, which was enhanced to twenty years for the PFO conviction. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

## I. FACTS.

Detective William Birkenhauer of the Northern Kentucky Drug Strike Force had an agreement with Gary Vanover, a police informant, whereby Vanover would assist Birkenhauer in setting up drug "sting" operations. On May 20, 1996, Birkenhauer and Vanover set up a meeting with Appellant for approximately 3:00 p.m. at Vanover's apartment. Birkenhauer instructed Vanover to tell Appellant that he wanted to purchase a quarter of an ounce of crack cocaine.

Birkenhauer testified that when he arrived at the apartment, Vanover answered the door and a female friend of Vanover was also present. Appellant then emerged from the bedroom. Appellant told Birkenhauer he had only $75.00 worth of cocaine with him, because he did not like to carry more than that on his person, but stated that he could complete the order later that afternoon. Birkenhauer told Appellant he would take the "75" and return later for the rest. Appellant then went back into the bedroom and instructed Vanover to follow him. When Vanover came out of the bedroom, he was carrying a baggie of crack cocaine which he gave to Birkenhauer. Birkenhauer gave Vanover the $75.00 and told him to tell Appellant that he would return later for the rest. Vanover reentered the bedroom, then came back out a few seconds later and accompanied Birkenhauer outside to his vehicle. Birkenhauer returned an hour and a half later, but neither Appellant nor Vanover was present at the apartment.

Vanover testified that the crack cocaine actually belonged to him, that he had made the sale to Birkenhauer, and that Appellant was not involved in the transaction. Appellant did not testify.

Unknown to either Appellant or Vanover, Birkenhauer was "wired" with an audio transmitter, and other police officers were in a nearby apartment with surveillance equipment and a receiver. One of those officers, Darin Smith, was listening to the transaction over the receiver. A tape recording of the transaction was produced, but the trial judge determined that the recording was inaudible and it was neither admitted into evidence nor played to the jury. However, Smith was permitted to testify to what he heard over the receiver as the transaction was occurring.

Smith testified that he saw Birkenhauer enter the apartment. He then heard four different voices, the first of which he recognized as being that of Birkenhauer. He then heard the voice of another male, the voice of a female, and, then later, a fourth voice which "sounded as if it was of a male black." Smith testified that he had been a police officer for thirteen years and had spoken to black males on numerous occasions; and that based on that experience, he believed the last voice which he heard was that of a black male. Appellant is a black male; Vanover is a white male. Smith then testified as follows:

Q: Based on that (Smith's experience), as best you can recall, I just want you to tell me what you can recall the conversation you heard between

Detective Birkenhauer, just telling the jury what the male black said, or the person you believed to be a male black.

A: That would have been the fourth and final voice on the tape. Detective Birkenhauer stated that he would take the "75" now and asked how long it would be, something along those lines, before he could get back with the additional drugs. What was believed to be a male black responded, fifteen or twenty minutes or so, I didn't bring it with me, I left it at my house, you know what I am saying, I didn't want to have it on me. Detective Birkenhauer said, I'll take the "75" now, and we will hook up later.

On cross-examination, the following colloquy occurred between Smith and defense counsel:

Q. Okay. Well, how does a black man sound?

A. Uh, some male blacks have a, a different sound of, of their voice. Just as if I have a different sound of my voice as Detective Birkenhauer does. I sound different than you.

Q. Okay, can you demonstrate that for the jury?

A. I don't think that would be a fair and accurate description of the, you know, of the way the man sounds.

Q. So not all male blacks sound alike?

A. That's correct, yes.

Q. Okay. In fact, some of them sound like whites, don't they?

A. Yes.

Q. Do all whites sound alike?

A. No sir.

Q. Okay. Do some white people sound like blacks when they're talking?

A. Possibly, yes.

## II. LAY OPINION TESTIMONY.

■ Appellant first argues that Smith's testimony amounted to an impermissible

interpretation of an inaudible tape recording. However, Smith did not purport to interpret the tape recording. He testified to what he, himself, heard as the transaction was taking place. *Gordon v. Commonwealth,* Ky., 916 S.W.2d 176, 180 (1995); *see also United States v. Cylkouski,* 556 F.2d 799 (6th Cir.1977) (parties to telephone conversations could testify with respect to those conversations even though the tapes of the conversations had been suppressed).

■ Appellant next asserts that Smith should not have been permitted to express his opinion that the fourth voice he heard sounded like that of a black male. A nonexpert witness may express an opinion which is rationally based on the perception of the witness and helpful to a determination of a fact in issue. KRE 701. A corollary to this rule is the concept known as the "collective facts rule," which permits a lay witness to resort to a conclusion or an opinion to describe an observed phenomenon where there exists no other feasible alternative by which to communicate that observation to the trier of fact. *See* R. Lawson, *The Kentucky Evidence Law Handbook* § 6.05, at 275–76 (3d ed. Michie 1993). Thus, lay witnesses have been permitted to testify to the speed of a moving vehicle, *Clement Bros. Constr. Co. v. Moore,* Ky., 314 S.W.2d 526 (1958); the age of a person and whether that person was intoxicated, *Howard v. Kentucky Alcoholic Beverage Control Bd.,* 294 Ky. 429, 172 S.W.2d 46 (1943); the degree of physical suffering endured by another, *Zogg v. O'Bryan,* 314 Ky. 821, 237 S.W.2d 511 (1951); and the mental and emotional state of another, *Commonwealth v. Sego,* Ky., 872 S.W.2d 441, 444 (1994), *Emerine v. Ford,* Ky., 254 S.W.2d 938 (1953). In *King v. Ohio Valley Fire & Marine Ins. Co.,* 212 Ky. 770, 280 S.W. 127 (1926), a witness was permitted to testify that upon arriving at the scene of a fire, he "smell[ed] gasoline." In response to the argument that the witness should have been permitted to merely

describe the odor, not to testify that the odor was that of gasoline, the Court held:

> Technically, perhaps, that should have been done, but the average man would have great difficulty in telling just how coal oil or gasoline smells, though acquainted with their odors, and perhaps the best description the witness could give was to say he knew their odors, and he could smell coal oil, or he could smell gasoline.

*Id.,* 280 S.W. at 130.

In each of the above examples, the witness was permitted to describe what he observed by use of inference, conclusion, or opinion. Whether the collective facts rule would permit a witness to express an opinion that an overheard voice was that of a particular nationality or race has never before been addressed in this jurisdiction. However, it is not an issue of first impression.

In *People v. Sanchez,* 129 Misc.2d 91, 492 N.Y.S.2d 683 (N.Y.Sup.Ct.1985), a lay eyewitness to a fatal shooting was permitted to testify that immediately prior to the shooting, he overheard the victim and the killer arguing in Spanish, and that the killer was speaking with a Dominican, rather than a Puerto Rican, accent. Citing *Richardson on Evidence,* § 366, at 329 (10th ed.1973), the opinion noted that lay witnesses have been permitted to testify to inferences of identity as to race, language, visibility and sounds. 492 N.Y.S.2d at 684. The court made the following observation with respect to the subject of accents and dialects:

> Accent is a branch of phonetics, which in turn, is a division of linguistics. While some writers use accent and dialect interchangeably, accent relates to how words are pronounced whereas dialect involves not only accent but particular speech patterns of a group or region. It is clear that lay witnesses can often detect the distinctive accent related to particular ethnic or geographic groups. Thus, a lay witness, depending upon his experience, could distinguish between a Yiddish accent and an Italian accent, or between a Russian and an English accent, or between a Spanish and French accent. In addition, within broad categories, certain more specific accents, characteristic of [a] particular region, may be ascertained. For example, the lay witness may be able to reliably identify the "Brooklyn" accent, as distinguished from the "Boston" accent, or the "Southern" accent from the "Cockney" accent. Human experience has taught us to discern the variations in the mode of speech of different individuals.

*Id.* at 684–85.

More specifically, in *Rhea v. State,* 104 Ark. 162, 147 S.W. 463 (1912), it was held that a witness may recognize and know the difference between voices of persons of different nationalities and races. *See also State v. McDaniel,* 392 S.W.2d 310 (Mo. 1965) (testimony that robbers had African–American accents was admissible to identify the probable race of the perpetrators); *State v. Phillips,* 25 N.C.App. 5, 212 S.E.2d 172 (1975) (testimony that robbers "sounded like black people talking" was admissible, because the witness was merely testifying to the dialect that he heard); *State v. Smith,* 307 S.C. 376, 415 S.E.2d 409 (App.1992) (testimony of radio dispatcher that caller was a white male, approximately forty years old, with a "very country and rugged, scratchy like voice" was admissible even though the witness was not an expert in voice identification); *State v. Kinard,* 39 Wash.App. 871, 696 P.2d 603 (1985) (testimony that one burglar "sounded black to me" and another sounded like a young white male, was held properly admitted).

No one suggests that it was improper for Officer Smith to identify one of the voices he heard as being that of a female. We perceive no reason why a witness could not likewise identify a voice as being that of a particular race or nationality, so long as the witness is personally familiar with the general characteristics,

accents, or speech patterns of the race or nationality in question, *i.e.,* so long as the opinion is "rationally based on the perception of the witness." KRE 701. A proper foundation was laid for Smith's testimony. That foundation was not eradicated by Smith's admission that the voices of some black men are indistinguishable from those of white men and vice versa. His inability to more specifically describe or to demonstrate "how a black man sounds" merely proves the reason for the collective facts rule, *i.e.,* that it would be difficult or impossible for the witness to give such a description or demonstration.

### III. HEARSAY.

■ Appellant claims that Smith's testimony was hearsay. However, Smith testified that the relevant statements were uttered by the last voice he heard, which he believed to be that of a black male, and Appellant was both the last person to enter the room (according to Birkenhauer) and the only black male present at the time the statements were made. Assuming Appellant was the declarant, the statements were admissible as admissions under KRE 801A(b)(1). Smith clearly could have identified Appellant as the declarant had he been familiar with Appellant's voice. KRE 901(b)(5); *United States v. Robinson,* 707 F.2d 811, 814 (4th Cir.1983); *Campbell v. Commonwealth,* Ky., 788 S.W.2d 260 (1990); *Howard v. Commonwealth,* Ky.App., 787 S.W.2d 264 (1989). When, as here, the witness is unfamiliar with the declarant's voice, the speaker's identity may be proven by circumstantial evidence. *United States v.. Espinoza,* 641 F.2d 153, 170 (4th Cir.1981), *cert. denied,* 454 U.S. 841, 102 S.Ct. 153, 70 L.Ed.2d 125 (1981); *United States v. Martinez,* 555 F.2d 1248, 1249–50 (5th Cir.1977), *cert. denied,* 434 U.S. 924, 98 S.Ct. 404, 54 L.Ed.2d 282 (1977); *United States v. Carrion,* 463 F.2d 704, 706–07 (9th Cir.1972); *Grogan v. United States,* 394 F.2d 287, 291 (5th Cir.1967), *cert. denied,* 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 100 (1968); *Cwach v. United States,* 212 F.2d 520, 525 (8th Cir.1954). Smith testified that the declarant's voice sounded like that of a black male. The fact that Appellant was the only black male present when the conversation took place was sufficient circumstantial evidence to satisfy the authentication requirement of KRE 901(b)(5) and bring the statement within the parameters of KRE 801A(b)(1).

### IV. SUFFICIENCY OF THE EVIDENCE.

■ Appellant asserts the evidence of his guilt was insufficient to overcome his motion for a directed verdict. However, even without Officer Smith's corroboration, Detective Birkenhauer's testimony that Appellant was the one who negotiated the transaction was sufficient for a reasonable juror to believe beyond a reasonable doubt that Appellant, not Vanover, was the purveyor of the crack cocaine. *Commonwealth v. Benham,* Ky., 816 S.W.2d 186 (1991).

### V. LESSER INCLUDED OFFENSES.

■ Appellant claims the trial judge erred by not instructing the jury *sua sponte* on possession of a controlled substance and facilitation to trafficking in a controlled substance as lesser included offenses of first-degree trafficking. Appellant did not preserve this alleged error by contemporaneous objection or by tendering the desired instructions. RCr 9.54(2). He requests review as palpable error. RCr 10.26. Although we have held it to be palpable error to instruct the jury on an offense not contained in the indictment, *cf. Caretenders, Inc. v. Commonwealth,* Ky., 821 S.W.2d 83, 86 (1991), we are unaware of any authority holding it to be palpable error to fail to instruct on a lesser included offense of that charged in the indictment.

■ Regardless, an instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury could have a reasonable doubt as to the defendant's guilt of the greater of-

fense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense. *Webb v. Commonwealth*, Ky., 904 S.W.2d 226 (1995); *Bills v. Commonwealth*, Ky., 851 S.W.2d 466, 469 (1993). The Commonwealth's theory of the case was that Appellant brought the cocaine to Vanover's apartment and sold it to Detective Birkenhauer. Appellant's theory was that Vanover had the cocaine in his apartment and sold it to Birkenhauer, and that Appellant's presence on that occasion was a mere coincidence. Since there was no evidence from which a jury could conclude that Appellant was guilty of either facilitation or possession of cocaine, but not trafficking in cocaine, he was not entitled to an instruction on either of those theories. *Commonwealth v. Day*, Ky., 983 S.W.2d 505 (1999); *Houston v. Commonwealth*, Ky., 975 S.W.2d 925 (1998).

Accordingly, the judgments of conviction and sentences imposed by the Campbell Circuit Court are affirmed.

GRAVES, JOHNSTONE, KELLER, and WINTERSHEIMER, JJ., concur.

JOHNSTONE, J., concurs by separate opinion in which GRAVES and KELLER, JJ., join.

STUMBO, J., dissents by separate opinion in which LAMBERT, C.J., joins.

JOHNSTONE, Justice, concurring.

I concur in the majority opinion in all respects, but write separately to dispute the dissent's misguided assertion that "the majority takes a tremendous step backwards with its holding today and permits prejudice and inference to convict a man where logic and objectivity would not." That is simply untrue.

The contentious issue confronted by the Court in this case is whether a lay witness may express an opinion as to the race of a person from an overheard voice. Despite any inferences to the contrary, other courts have previously addressed this issue and allowed such lay witness opinion testi-

mony. The majority opinion cites cases in which lay witnesses have been allowed to identify voices as sounding like white, as well as black, persons.

The adoption of KRE 701 in this Commonwealth signaled this Court's intention to follow the modern trend clearly favoring the admission of such lay opinion evidence. KRE 701 reflects the philosophy of this Court, and most courts in this country, to view KRE 701 as more inclusionary than exclusionary when the lay witness's opinion is rationally based on the perception of the witness and is helpful to the jury or trial court for a clear understanding of the witness's testimony or the determination of a factual issue.

Moreover, the guidelines set out in KRE 401 and KRE 403 regarding relevance and whether the probative value of relevant evidence is outweighed by its prejudicial effect are decisions for the trial court. Those decisions will not be disturbed in the absence of an abuse of discretion. *Partin v. Commonwealth*, Ky., 918 S.W.2d 219, 222 (1996).

Sadly, the dissent has spun this evidentiary issue into a needless racial diatribe. It is my opinion that as we approach the next millennium, the majority opinion perpetuates the time-honored deference to the discretion of trial judges in this Commonwealth and allows additional valuable evidence to be considered by the diverse group of jurors that serve so diligently in the Kentucky Court of Justice.

GRAVES and KELLER, JJ., join this concurring opinion.

STUMBO, Justice, dissenting.

With much dismay, I must dissent. The majority opinion is not only fundamentally flawed on several levels, but is also tremendously disheartening. The opinion condones the admission of Officer Smith's testimony that the voice of the fourth speaker he heard on the tape "sounded as if it was of a male black." This testimony not only impermissibly bolstered the testi-

mony of Detective Birkenhauer, whose version of events inculpating Appellant had been called into serious question by the testimony of the Commonwealth's own informant, but also was incredibly prejudicial to Appellant, the sole black man sitting at the defense table. Additionally, the testimony was, by Officer Smith's own admission, entirely irrelevant and probative of absolutely nothing. Thus, it should have been excluded under KRE 403 as being more prejudicial than probative.

I must first object to the basic premise which underlies the majority's rationale in this case—that a person's race can be ascertained simply by the sound and cadence of his voice, his pronunciation of certain words—his accent. An accent may be indicative of many things—how a person's parents speak, the countries, regions or even neighborhoods in which he has lived, the schools he has attended, the languages he speaks, his social class, and even whom he admires. What it most definitely cannot indicate is the color of his skin.

Common sense should tell us this. The quality of a particular voice is sensed by hearing, just as the appearance of a person is sensed by sight. It is simply not possible to perceive appearance using the sense of hearing. One might presume that a particular voice or accent would be indicative of how the speaker might look. However, that presumption would be based solely on preconceived ideas, stereotypes, and assumptions, not on logic or reality.

Race, that is, skin color, must be perceived by sight. To say that a person is capable of ascertaining another's race solely by hearing his voice is tantamount to saying the one can "hear a color" or "smell a sound" or "taste a noise." One can no more determine that a person's skin is pale, cinnamon, or ebony simply by hearing his voice, than one can perceive that an individual will have a British accent, a Portuguese accent, a New York accent or an Appalachian accent simply by gazing at his countenance and the color of his skin. Thus, it was entirely improper to permit

Officer Smith to testify that the fourth voice on the videotape "sounded black." This type of testimony would be improper in any context, but it is all the more so because the defendant was the lone black man sitting at the defense table. Although Appellant's voice was unknown to both Smith and the jury, the overwhelming inference was that Appellant was the fourth speaker, and thus guilty as urged by Detective Birkenhauer.

The majority holds Officer Smith's opinion that the voice on the tape sounded like that of a black man is perfectly acceptable as lay opinion which is *rationally based* on Smith's perception, because "Smith testified that he had been a police officer for thirteen years and had spoken to black males on numerous occasions." As discussed above, I fail to see any rationality to the notion that *one can hear a person's skin color.* Let us, for the moment, assume that what Officer Smith was inartfully attempting to say, is that the voice he heard on the tape was spoken in an accent or dialect which he associated with African Americans, for reasons which he could not explain because he was not a linguist. This being so, Smith's observations were still entirely inadmissible absent any showing that Appellant, himself, speaks with this kind of accent. As Smith had never heard Appellant speak and as Appellant chose not to testify at trial, there was no way to connect Appellant to the particular type of accent described by Smith. Instead, the jury was simply left with the impermissible inference that because Smith associated the voice with African Americans, and because Appellant was an African American, Appellant must be the person Smith heard.

Smith himself conceded the illogicality and irrelevance of his own testimony. Upon cross-examination, Smith acknowledged not all black men sound alike, nor do all white men. He also acknowledged that some African American men "sound like whites," and that "some white people sound like blacks." In essence, Smith con-

ceded that Appellant's voice and accent might sound like the accent Smith associated with African Americans, but that it might not. He could say no more, because he had never heard Appellant's voice. Evidence is relevant when it tends to make the existence of a disputed issue more probable or less probable than it would be without the evidence. KRE 401. Here, Smith's testimony that the voice he heard sounded like an "African American accent" in no way tended to increase the probability that Appellant was the speaker, because there was no showing that Appellant, himself, spoke in the manner described. As Smith's testimony was clearly irrelevant, yet undoubtedly extremely prejudicial to Appellant, it should have been excluded under KRE 403.

Finally I must take issue with the primary case the majority cites in an effort to find support for its unfortunate holding. Somehow, the majority has improperly broadened the issue before us to that of whether a lay witness may "express an opinion that an overheard voice was that of a particular nationality or race." In so doing, the majority quotes at length from the case of *People v. Sanchez*, 129 Misc.2d 91, 492 N.Y.S.2d 683 (N.Y.Sup.Ct.1985), a case which is easily distinguishable from the instant controversy. There, the question was whether the suspect was speaking Spanish in a Dominican or Puerto Rican accent. That case in no way dealt with the issue of accent as it relates to race or skin color, but rather as it relates to nationality. Given that one's accent is largely affected by the country or region he or she grows up in, it is entirely reasonable to permit identification of a nationality based on a particular kind of accent, so long as the listener is familiar with the accent of that particular nationality. Such is not the case with the color of a person's skin, which has absolutely no impact on the way a person speaks. I find the fact that the majority seems unable to grasp this obvious distinction to be extremely disconcerting.

As we approach the next millennium, the majority takes a tremendous step backwards with its holding today and permits prejudice and inference to convict a man where logic and objectivity would not.

LAMBERT, C.J., joins this dissenting opinion.