**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 06-4172**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

KOON CHUNG WU, a/k/a Alex Wu, a/k/a Joe Wu,

Defendant - Appellant.

_____

Appeal from the United States District Court for the Middle
District of North Carolina, at Durham. William L. Osteen, District
Judge. (1:05-cr-00269-WLO)

_____

Submitted: January 4, 2007          Decided: February 2, 2007

_____

Before WILKINS, Chief Judge, and WILLIAMS and KING, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

Louis C. Allen, III, Federal Public Defender, Greensboro, North
Carolina, for Appellant. Anna Mills Wagoner, United States
Attorney, Randall S. Galyon, Assistant United States Attorney,
OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina,
for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

After the district court denied his motion to suppress evidence, Koon Chung Wu entered a conditional guilty plea to using over forty counterfeit credit cards with an intent to defraud, in violation of 18 U.S.C.A. § 1029(a)(1) (West 2000), and to using unauthorized credit cards to obtain items collectively valued at approximately $300,000, in violation of 18 U.S.C.A. § 1029(a)(2). Wu reserved his right to appeal the district court's denial of his suppression motion. On appeal, Wu argues that the evidence against him was obtained in violation of the Fourth Amendment. For the reasons that follow, we affirm the district court's denial of Wu's motion to suppress evidence and, accordingly, affirm his convictions.

I.

The facts of this case are undisputed. On May 9, 2005, officers from the Cabarrus County, North Carolina Sheriff's Office received a tip about a suspicious package located at the United Parcel Service (UPS) distribution center in Kannapolis, North Carolina. The tip suggested that the package contained controlled substances. The officers located the package, which weighed approximately forty-four pounds and was labeled "books," and determined that it had been shipped via UPS's overnight service by "Alex Wu" from a UPS office in Concord, North Carolina. The

2

officers called in a North Carolina State Highway Patrol K-9 unit to conduct a drug dog sniff of the package. Trooper G.A. Barger arrived with his drug detection dog "Cody," and Cody sniffed three separate "lineups" of packages that included the suspicious package and packages known not to contain controlled substances. Each time Cody alerted to the presence of controlled substances in the suspicious package.

On the basis of Cody's positive alerts, Detective T.D. Parker applied for and obtained a search warrant to search the package for controlled substances. Aside from describing the tip about the package and Cody's alerts to the presence of controlled substances, the warrant affidavit also described Cody's training and certification as a drug-detection dog. The affidavit stated in pertinent part that

> Trooper G. Barger, of the North Carolina State Highway Patrol, and narcotics detection K-9 "Cody," are certified as a team in narcotics detection by the North Carolina Police Work-dog Association. Trooper G.A. Barger and "Cody" graduated from the North Carolina State Highway Patrol K-9 Detection School in affiliation with the North American Police Work-dog Association, on April 30, 2004. They successfully completed 240 hours of instruction from March 2004 through May 2004. During this training and certification period "Cody" has been allowed to sniff a large number of packages, parcels and luggage. When "Cody" has alerted to any of these items, narcotics have been present in the overwhelming majority of these cases. Trooper Barger and "Cody" also completed one re-certification session at the Cumberland County Sheriff's Office on January 14, 2005. These re-certification courses are designed to update previous certifications and to confirm narcotics detection ability.

3

(J.A. at 22-23. (footnote omitted))

The officers searched the package but did not find any drugs. Instead, they found three Rolex watches, three Apple iPods, three Sony DVD camcorders, two Sony PlayStation consoles, three digital cameras, and several other small electronic items. The Cabarrus County Sheriff's office seized the items, which were all new and unopened in their original boxes.

On June 27, 2005, Parker received information about two more suspicious packages located at the UPS office in Concord, North Carolina. The packages, also labeled as containing "books," had been dropped off for shipment by "Joe Wu, 903 Lilly Green Court, Concord, NC." Barger and Cody were called in for a drug-dog sniff of these packages, and Cody alerted to the odor of controlled substances on one of the packages. Based on Cody's alert, Detective D.J. Degrace applied for a search warrant to search the two packages. In the warrant affidavit, Degrace repeated the information about Cody's training that was included in the May 9 warrant application. The affidavit also described Cody's alert to the package and stated that Degrace "received information, corroborated by Trooper G. Barger, that the same person shipping the packages was responsible for sending a package on May 9, 2005 through UPS weighing 45 pounds that contained thousands of dollars of stolen merchandise." (J.A. at 12.) The affidavit also noted that "'Cody' positively alerted for the presence of controlled

4

substances odor on one of the packages [searched on May 9]." (J.A. at 12.) Accordingly, Degrace sought a warrant to "inspect the contents of the two packages for controlled substances and/or stolen property." (J.A. at 13.)

The warrant issued, and the officers searched the packages. They found four Apple laptop computers, five Sony Vaio laptop computers, one Sony digital recorder, one Canon digital camera, and one Apple 20GB iPod. As was true of the items seized in the May 9 search, all of the items were new and unopened in their original boxes. The Cabarrus County Sheriff's Office seized these items as well.

The officers transported the seized items to the Sheriff's Office, where Detective Carl Gadd inspected them. During his inspection, Gadd noticed a green "Office Depot Store #41" sticker on one of the Sony Vaio laptops. He contacted Dee Moore, the assistant manager of Office Depot Store #41, in Charlotte, North Carolina, to determine if the computer had been purchased using a fraudulent credit card. Gadd gave Morrison identifying information about the computer, and Morrison told Gadd that she would research the transaction. The next day Morrison informed Gadd that a Visa credit card number ending in 9746 was used to purchase the computer. Gadd contacted the credit card issuer, Navy Federal Credit Union, and determined that the card had been used fraudulently. The counterfeit card used at the time of purchase

was embossed with the name Tom E. Russo, and the individual who used the credit card provided a counterfeit identification card in the same name. The officers contacted the legal owner of the credit card number, a Mr. Roberts from Virginia, and confirmed that the card information had been stolen and used for unauthorized transactions. The officers also discovered that two additional fraudulent transactions had been made with the counterfeit card, one for $1504.99 at an Office Depot in Charlotte and one for $428 at Office Max in Gastonia, North Carolina.

Based on this information, Gadd obtained a search warrant for 903 Lilly Green Court, Concord, North Carolina, the shipper's address on the packages. The warrant authorized the officers to search for counterfeit credit cards, counterfeit identification cards, financial records, machinery used in the counterfeiting of credit cards and identification cards, bank records, various types of electronic equipment, and watches. On June 28, 2005, Cabarrus County detectives executed the warrant and searched the Lilly Green Court residence. Wu and a woman named Carmen Marie Hensley were present at the residence when the officer arrived to conduct the search. The officers discovered and seized fifty-eight counterfeit credit cards and four counterfeit New York driver's licenses. They also seized the following items: two large flat screen plasma/LCD televisions; approximately $3,800 in cash; several computers; dozens of DVD movies; several HDTV receivers; stereo equipment;

6

iPods; and a 1996 Lexus four-door sedan.  These items had a total value of approximately $100,000.  The officers arrested Wu and Hensley immediately, and Wu was charged with twenty-seven counts of felony financial card forgery in the Cabarrus County District Court in Concord.[1]

On June 29, 2005, U.S. Secret Service agents interviewed Wu and Hensley.  Special Agent James Motley interviewed Wu.  Prior to the interview, Motley advised Wu of his <u>Miranda</u> rights, which Wu acknowledged and waived in writing.  Following the interview, Wu provided a written, signed statement in which he made numerous incriminating admissions, including describing in some detail how he and Hensley conducted their counterfeiting enterprise.  Hensley also made numerous incriminating statements during her interview.  Wu admitted that between January 2005 and June 2005 he and Hensley obtained approximately $300,000 in merchandise through counterfeit credit cards.[2]

On July 26, 2005, a grand jury sitting in the Middle District of North Carolina returned a two-count indictment against Wu and Hensley, charging them with using over forty counterfeit credit

---

[1]These charges were dismissed on July 6, 2005, in light of the federal indictment against Wu.

[2]Drug dog sniffs of the Lexus sedan and the Lilly Green residence resulted in positive alerts for the presence of controlled substances.  While no illegal drugs were found in either the sedan or the residence, both Wu and Hensley admitted that they used controlled substances and Hensley admitted that she stored drugs on occasion in the sedan and the residence.

cards with intent to defraud, in violation of 18 U.S.C.A. § 1029(a)(1), and with using unauthorized credit cards to obtain items collectively valued at over $300,000, in violation of 18 U.S.C.A. § 1029(a)(2).

On August 3, 2005, Wu appeared for arraignment and pleaded not guilty to the indictment. Wu then filed a motion to suppress the evidence obtained from the May 9 and June 27 searches of the UPS packages and the June 28 search of his home. He claimed that the officers lacked probable cause for both the May 9 and June 27 searches because the Government had not demonstrated Cody's reliability as a drug-detection dog. Wu also requested a hearing under Franks v. Delaware, 438 U.S. 154 (1978) on the ground that the warrant affidavits for the May 9 and June 27 searches contained knowing or reckless falsity that misled the magistrate; Wu claimed that the affidavits greatly overstated Cody's accuracy in drug sniffs. Accordingly, Wu contended that all evidence that flowed from the search -- including the contents of the packages, the items seized from his residence, and the incriminating statements made by both him and Hensley -- should be suppressed as fruit of the poisonous tree under Wong Sung v. United States, 371 U.S. 471 (1963).

On September 12, 2005, the district court conducted a hearing and denied Wu's motion to suppress. The court concluded that probable cause existed for both the May 9 and June 27 searches.

8

The court also held that Wu had not made the substantial preliminary showing necessary to justify a <u>Franks</u> hearing because it found that the representation in the warrant affidavits that Cody had been accurate in an "overwhelming majority" of cases was not "particularly inaccurate." (J.A. at 195.)

Following the district court's rulings, Wu entered a conditional guilty plea to both counts of the indictment, preserving only his right to appeal the district court's ruling on his motion to suppress. On January 27, 2006, the district court sentenced Wu to 48 months' imprisonment on each count, to run concurrently, and to three years' supervised release. Wu timely noted an appeal. We have jurisdiction to hear this appeal pursuant to 28 U.S.C.A. § 1291 (West 2006).

## II.

On appeal, Wu argues that the district court erred in denying his motion to suppress because (1) the warrant affidavits for the May 9 and June 27 searches did not establish probable cause for the searches and (2) the searches were also unconstitutional because the officer-affiants made representations in the warrant affidavits that were knowingly false or indicated a reckless disregard for the truth. We address each argument in turn.

A.

In considering a district court's ruling on a motion to suppress evidence, we review questions of law de novo and findings of historical fact and reasonable inferences drawn from those findings for clear error. Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Moreland, 437 F.3d 424, 429 (4th Cir. 2006). Because the district court denied Wu's motion to suppress, we view the facts adduced at the suppression hearing in the light most favorable to the Government. United States v. Holmes, 376 F.3d 270, 273 (4th Cir. 2004).

Our legal inquiry begins with the Fourth Amendment, which provides that people are "to be secure in their persons . . . against unreasonable searches and seizures . . . and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. Probable cause exists when, after considering the totality of the circumstances, there is a "'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Grubbs, 126 S. Ct. 1494, 1499 (2006)(quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). "The probable cause standard does not demand any showing that such a belief be correct or more likely true than false." Simmons v. Poe, 47 F.3d 1370, 1379 (4th Cir. 1995)(internal quotation marks omitted). It is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent

men, not legal technicians, act." <u>United States v. Humphries</u>, 372 F.3d 653, 657 (4th Cir. 2004)(internal quotation marks omitted). Accordingly, we "have always applied a highly deferential standard of review in considering the sufficiency of a finding of probable cause by a magistrate." <u>Simmons</u>, 47 F.3d at 1378.

We have stated that "[t]he detection of narcotics by a trained dog is generally sufficient to establish probable cause." <u>United States v. Robinson</u>, 707 F.2d 811, 815 (4th Cir. 1983); <u>see also</u> <u>United States v. Jeffus</u>, 22 F.3d 554, 557 (4th Cir. 1994)("When the dog 'alerted positive' for the presence of drugs, the officer was given probable cause for the search that followed."). Of course, implicit in our statement in <u>Robinson</u> is the assumption that a drug dog's positive alert for contraband must possess some indicia of reliability for the alert to establish probable cause. Our sister circuits have held that a search warrant based on a positive alert by a drug dog is sufficient on its face to establish probable cause if the affidavit supporting the warrant states that the dog is trained and certified to detect controlled substances. <u>See, e.g.</u>, <u>United States v. Kennedy</u>, 131 F.3d 1371, 1376-77 (10th Cir. 1997)("As a general rule, a search warrant based on a narcotics canine alert will be sufficient on its face if the affidavit states that the dog is trained and certified to detect narcotics."); <u>United States v. Berry</u>, 90 F.3d 148, 153 (6th Cir. 1996)(holding that an affidavit need not describe the particulars of the dog's

11

training; an affidavit's description of a drug dog's positive alert for controlled substances coupled with a reference to the dog's training in narcotics investigations is enough to establish probable cause); United States v. Klein, 626 F.2d 22, 27 (7th Cir. 1980)(holding that a statement that a dog graduated from training class and has proven reliable in detecting drugs on prior occasions is sufficient to support probable cause).

Assuming that evidence of a drug dog's training and certification is needed to establish the dog's reliability, such evidence was clearly present in the instant case. Aside from providing accounts of Cody's positive alerts to the packages, the affidavits supporting both the May 9 and June 27 warrants described in some detail Cody's training and certification as a drug-detection dog, including describing how Trooper Barger and Cody had completed 240 hours of instruction from March 2004 through May 2004 and noting that Barger and Cody had completed one re-certification session on January 14, 2005 to "confirm narcotics detection ability." (J.A. at 23.)

We believe that this evidence of Cody's training and certification was enough by itself to establish Cody's reliability so that his positive alerts for controlled substances established probable cause for both the May 9 and June 27 searches. Probable cause only requires a "fair probability" that contraband will be found in a certain place, Gates, 462 U.S. at 238, and Cody's

12

positive alerts to the packages in both searches clearly established a fair probability that the packages contained controlled substances, given his training and certification as a drug-detection dog.

In addition to reviewing the evidence of Cody's training and certification, however, the district court also heard testimony from Trooper Barger, Cody's handler, about Cody's performance statistics and his field experience from March 2005 to May 2005. The district court found that Cody had demonstrated an impressive degree of accuracy in training exercises, and based on its review of Cody's past field sniffs, the court found that Cody was accurate approximately 67% of the time in the field when sniffing for narcotics.[3] While we believe that this factual finding was unnecessary for the district court to have concluded that probable cause existed for the searches given the evidence of Cody's training and certification, it serves to bolster the court's determination that Cody was sufficiently reliable for his positive alerts to establish probable cause for the May 9 and June 27 searches. See United States v. Robinson, 390 F.3d 853, 874 (6th Cir. 2004)("[A]fter it is shown that the dog is certified, all

---

[3]Wu incorrectly states in his opening brief that the district court found that Cody was 60% accurate in the field when sniffing for controlled substances. The district court clearly found that, from March 2005 to May 2005, drugs were found six times when Cody alerted and were not found three times, which, when expressed as a percentage, was a finding that Cody was accurate approximately 67% of the time in the field.

13

other evidence relating to his accuracy goes only to the credibility of the testimony, not to the dog's qualifications." (internal quotation marks omitted)).

Despite this, Wu argues that the officers lacked probable cause to conduct the June 27 search of the packages because Cody had already proven unreliable – Cody had positively alerted for the presence of controlled substances when none were present -- in the May 9 search. Cody's apparently "false" alert on May 9, however, does not undermine the entire body of his previous work. That Cody positively alerted to the presence of controlled substances when none were found certainly is a factor to be considered under the totality of the circumstances in determining whether probable cause existed for the June 27 search, see Robinson, 390 F.3d at 874, but the reliability of a drug-detection dog does not rise or fall on the basis of one sniff. Cody had proven very accurate in sniffs during his training. Moreover, factoring the May 9 alert into the district court's original calculation of Cody's field accuracy rate, Cody would still have been "correct" six times and "incorrect" four times, rendering an accuracy rate of 60%. Because "the probable cause-standard does not require that the officer's belief be more likely true than false," Humphries, 372 F.3d at 660, an accuracy rate of 60% is more than reliable enough for Cody's alert to have established probable cause. Thus, even without considering the information in the June 27 warrant affidavit

14

concerning the stolen goods[4] found during the May 9 search,

_____

[4]There is no indication in the record as to how the officers determined that the items seized in the May 9 search were stolen. In a brief styled as a "Supplemental Brief," however, Wu argues for the first time on appeal that the Cabarrus County officers' seizures of the electronic items uncovered in the May 9 and June 27 searches were illegal under the Fourth Amendment.  Relying on the Supreme Court's decision in <u>Marron v. United States</u>, 275 U.S. 192, 196 (1927), Wu contends that because the warrants only authorized searches for controlled substances, the officers' seizures of the electronic items unconstitutionally transformed the warrants into general warrants by violating the rule that a warrant describe with particularity the things to be searched/seized.  Wu further contends that the "plain view" exception does not apply here because the contraband nature of the electronic items could not have been immediately apparent to the officers who searched the packages.

This argument is wholly different from the argument that Wu makes in the argument section of his opening brief.  In his opening brief, Wu only makes probable cause challenges to the initial <u>searches</u> of the packages, focusing exclusively on Cody's reliability, and does not argue that the <u>seizures</u> of the items found in the packages violated the Fourth Amendment.  He also contends in his opening brief that the affidavits supporting the May 9 and June 27 searches contained knowing or reckless falsity. Because Wu did not challenge the legality of the seizures in his opening brief, and because this argument was readily available to him at the time that he filed his opening brief, his argument that the seizures violated the Fourth Amendment is waived.  <u>See</u> Fed. R. App. P. 28(a)(9)("[T]he argument [section of appellant's brief] . . . must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."); <u>Yousefi v. INS</u>, 260 F.3d 318, 326 (4th Cir. 2001) (holding that petitioner waived argument on appeal raised for the first time in his reply brief by failing to raise it in his opening brief).  As we recently noted, "considering an argument advanced for the first time in a [supplemental] filing is not only unfair to the appellee, it also creates the risk of an improvident or ill-advised opinion being issued on an unbriefed issue."  <u>United States v. Leeson</u>, 453 F.3d 631, 638 n.4 (4th Cir. 2006).  Accordingly, because Wu has waived his argument concerning the legality of the seizures, we do not address it.

probable cause existed for the June 27 search based on Cody's positive alert to the presence of controlled substances in the package. Under the totality of the circumstances, the officers' knowledge at the time of the June 27 search that the items seized in the May 9 search had been stolen only further solidified the probable cause finding.

B.

In his final argument, Wu contends that the May 9 and June 27 searches were constitutionally tainted because the officers preparing the warrant affidavits provided information that was knowingly false or at the least indicated a reckless disregard for the truth. Specifically, Wu argues that the statement in both affidavits that controlled substances have been recovered in an "overwhelming majority" of cases when Cody has positively alerted misled the magistrate because the officers knew that Cody had only demonstrated around 67% accuracy in the field. Wu also argues that the "overwhelming majority" statement was especially untruthful when it was included in the June 27 warrant affidavit because Cody had recently falsely alerted in the May 9 search.

While warrant affidavits are presumed valid, an affiant may be impeached by a showing of deliberate falsity or reckless disregard for the truth. Franks, 438 U.S. at 155-56; United States v. Jones, 913 F.2d 174, 176 (4th Cir. 1990). A defendant is entitled to a

16

<u>Franks</u> hearing only after making "a substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and that the false information was essential to the probable cause determination. <u>Franks</u>, 438 U.S. at 155-56. Even then, a <u>Franks</u> hearing is not required "if, when [the] material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." <u>Id.</u> at 171-72.

We agree with the district court that Wu did not make the requisite substantial preliminary showing to justify a <u>Franks</u> hearing. The statement that Cody has been accurate in an "overwhelming majority" of cases simply does not rise to the level of knowing falsity or reckless disregard for the truth. Indeed, although the district court reasonably found that the statement referred to Cody's accuracy in training exercises, not field sniffs, we agree with the district court that even if the statement referred to Cody's accuracy in the field, it was not "particularly inaccurate" given Cody's 67% accuracy in his previous field experiences. (J.A. at 195.) Moreover, even if we were to excise the challenged statement from the affidavits, there was still sufficient information in both the May 9 and June 27 warrant affidavits to establish probable cause: both affidavits described Cody's training and certification, along with describing his

17

positive alerts to the packages, and the June 27 affidavit added the information about the stolen goods retrieved during the May 9 search.  We therefore conclude that the district court did not err in denying Wu a <u>Franks</u> hearing.[5]

## III.

Because we hold that probable cause existed for both the May 9 and June 27 searches of the UPS packages, we affirm the district court's denial of Wu's motion to suppress.  Accordingly, we affirm his convictions.

<u>AFFIRMED</u>

---

[5]Because we conclude that probable cause existed for both the May 9 and June 27 searches even if the "overwhelming majority" representation is excised from the affidavits, we need not reach Wu's argument, based on <u>United States v. Leon</u>, 468 U.S. 897 (1984), that the "good faith" exception does not apply in this case.