**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Edward Dane JEFFUS, Defendant–Appellant.**

**No. 93–5126.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 11, 1994.

Decided April 22, 1994.

---

**ARGUED:** John Stuart Bruce, Deputy Federal Public Defender, Greensboro, NC, for appellant. Paul Alexander Weinman, Asst. U.S. Atty., Greensboro, NC, for appellee. **ON BRIEF:** William E. Martin, Federal Public Defender, Greensboro, NC, for appellant. Benjamin H. White, Jr., U.S. Atty., Greensboro, NC, for appellee.

Before NIEMEYER, Circuit Judge, BUTZNER, Senior Circuit Judge, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Senior Circuit Judge BUTZNER and Senior District Judge JOSEPH H. YOUNG joined.

## OPINION

NIEMEYER, Circuit Judge:

Edward Dane Jeffus pled guilty to drug charges, reserving for appellate review his motions to suppress incriminating evidence seized in four separate searches. *See* Fed. R.Crim.Proc. 11(a)(2). The first search, from which the government obtained cocaine, drug paraphernalia, and a firearm, took place in August 1991 during a traffic stop on Interstate 95 in Florida after a trained dog sniffed the outside of Jeffus' vehicle and alerted positive for the presence of drugs. The second search, of a motel room in Winston–Salem, North Carolina, took place several months later. It was conducted pursuant to a warrant and yielded evidence of Jeffus' presence there and cocaine residue. The third search was of Jeffus' person incident to his arrest on the same day that the motel room was searched, and a significant quantity of cocaine was found as a result. And the final search, which was of Jeffus' jail cell pursuant to a warrant while he was being

detained pending trial, produced incriminating letters between Jeffus and co-conspirators. Although each of these searches presents different Fourth Amendment issues, we affirm the district court's ruling that none of them violated Jeffus' Fourth Amendment rights.

I

In the early evening hours of August 1, 1991, Officer Chet L. Tomlinson of the Florida Highway Patrol, who was entering Interstate 95 in Florida from a rest stop, observed Jeffus' 1986 Chevrolet Celebrity in the traffic lanes with a broken headlight. In order to make a traffic stop, Officer Tomlinson slowed as he approached the traffic lanes to let the Jeffus vehicle pass. But Jeffus, too, slowed his vehicle so as not to pass Officer Tomlinson's. After Officer Tomlinson reached the speed of 35 miles per hour and Jeffus still did not pass, the officer pulled over to the emergency lane and stopped to force Jeffus to pass. Officer Tomlinson then pulled Jeffus over to the shoulder.

After Jeffus produced a North Carolina driver's license, Officer Tomlinson advised Jeffus of the traffic violation for the broken headlight, as well as violations for a cracked windshield and a "busted" tail light. The officer gave Jeffus a faulty equipment notice and initiated a driver's license check. While completing the paperwork for the warning ticket for the various violations, Officer Tomlinson asked Jeffus about a beer bottle that the officer observed in Jeffus' car when he first approached it. When Jeffus went to retrieve the bottle, he opened the car door only wide enough to fit his body through and retrieve the bottle. In response to the officer's questions about Jeffus' trip plans, Jeffus indicated that he had been on business in Miami. Jeffus gave some conflicting answers in his response and began acting "nervous and fidgety," and the officer noticed that Jeffus' hands "trembled noticeably."

Officer Tomlinson returned Jeffus' license and registration, together with the faulty equipment notice, stating that he was still waiting for the report on Jeffus' license. By then, Officer Tomlinson testified he began to become suspicious about Jeffus' conduct. Officer Tomlinson asked Jeffus if Jeffus would permit a search of the vehicle. When Jeffus refused, the officer, who was a member of the canine patrol, had his specially trained dog sniff the outside of the vehicle, and the dog "alerted positive" to the presence of drugs. At that point, Officer Tomlinson searched the vehicle, discovering two plastic bags of cocaine, a firearm, and drug paraphernalia. The total time from the stop to the search was "no longer than" fifteen minutes. Thereafter, the officer received the report that Jeffus' driving license had been suspended by North Carolina.

Jeffus contends that the stop and the search were illegal because the traffic stop was pretextual and did not satisfy the test of whether a "reasonable officer" would have stopped the vehicle for the equipment violations. Urging us to adopt this "reasonable officer" standard for determining whether a traffic stop was pretextual, in lieu of an objective inquiry into whether the stop could legally have been made, he relies on *United States v. Guzman*, 864 F.2d 1512 (10th Cir. 1988), and *United States v. Smith*, 799 F.2d 704 (11th Cir.1986). Jeffus also contends that the stop was "prolonged" and "beyond the scope of a traffic stop," again relying on *Guzman*.

In *United States v. Rusher*, 966 F.2d 868, 876 (4th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992), we noted that a split of authority existed among the circuits with respect to whether a traffic stop, overtly made for a minor traffic violation but alleged to have been made to investigate for contraband, could properly serve as a basis for a subsequent search. The Tenth and Eleventh Circuits had taken the position advanced by Jeffus in this case, "that an investigative stop is valid as not pretextual, *not* if an officer legally could have stopped the car in question because of the suspected traffic violation, but rather if 'a reasonable officer would have made the seizure in the absence of illegitimate motivation.'" *Id.* at 876 (quoting *United States v. Smith*, 799 F.2d at 708). We also observed that a different position had been taken by the Fifth, Seventh, and Eighth Circuits, that "an investigative stop is justified at its inception if the

officer was legally entitled to make the stop; 'so long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional.'" *Id.* at 876 (quoting *United States v. Trigg,* 878 F.2d 1037, 1041 (7th Cir.1989), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991)). In *Rusher,* however, we found it unnecessary to pronounce the Fourth Circuit's standard because the stop there was legal under either standard.

■ After the issues in this case had been briefed, we decided *United States v. Hassan El,* 5 F.3d 726 (4th Cir.1993), where we declined to adopt the Tenth and Eleventh Circuits' standard in *Guzman* and *Smith* and, instead, adopted the Fifth, Seventh and Eighth Circuits' standard that any traffic stop, which is legally justified at its inception, is constitutionally valid for the purpose of a search later conducted on probable cause. *Id.* at 730. We believe that this decision now disposes of Jeffus' argument that the stop in this case was pretextual and therefore illegal. Regardless of the motive behind the stop, Jeffus' vehicle, in failing to have proper safety devices, was in violation of various Florida equipment statutes and was justifiably stopped under *Hassan El.*

■ Jeffus contends that even if the stop was justified, its length was beyond the scope of a traffic stop. The facts, however, belie his claim. The stop prior to the search, which lasted no more than fifteen minutes, was devoted to issuing an improper equipment notice and checking Jeffus' license. *See Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (traffic stop must be "reasonably related in scope to the justification" for the stop). It was while waiting for the report back on the license check that Jeffus and the officer engaged in the conversation which led to the dog's sniff of the vehicle. Having the trained dog sniff the perimeter of Jeffus' vehicle, which had been lawfully stopped in a public place, did not of itself constitute a search. *See United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983). When the dog "alerted positive" for the presence of drugs, the officer was given probable cause for the search that followed.

■ It should be noted that the entire time before the search was occupied with traffic stop procedures. It is a routine and proper police procedure to run a check on a driver's license after a traffic stop, and in this case, the report established that Jeffus' license had been suspended. In these circumstances, we conclude that the 15–minute period prior to the search was not unreasonable for a traffic stop and did not constitute an unlawful seizure in violation of the Fourth Amendment. *See Rusher,* 966 F.2d at 877 (during routine traffic stop, police may detain driver long enough to run a computer check to verify his entitlement to operate vehicle).

II

Approximately six months later, in early February 1992, Detective David Lamb of the Winston–Salem, North Carolina, Police Department received anonymous information through a "crimestopper" telephone call that three persons, named Dale, Irene, and Dawn Kennedy, were distributing drugs transported from Florida out of Room 215 at the Travel Host Motel in Winston–Salem. A few days later, Detective Lamb learned from a confidential informant that Dawn Kennedy and Irene Harry were in Room 216 (not Room 215), waiting for Dane Jeffus to bring a shipment of cocaine from Florida. The informant indicated that cocaine distribution from Room 216 was occurring at a rate of approximately one pound to one kilogram every two weeks. The informant also advised that the cocaine was being distributed locally from a blue Geo Prism and a burgundy Pontiac. According to Detective Lamb, the confidential informant had previously provided information that was found to be "truthful and reliable" and which led to arrests for drug violations.

After Detective Lamb received this information, he checked with the management of Travel Host Motel and found that Room 216 was registered to Irene Harry. He also searched an abandoned trash bag in front of Room 216 and discovered discarded mail addressed to Jeffus, a key tag for a 1979 Pontiac Firebird with a price of $1895 written on it, and a plastic baggie corner and straw with

cocaine residue. On the basis of the crime-stopper tip, the information from the informant, and Detective Lamb's own search of the abandoned trash, Detective Lamb obtained a search warrant and, pursuant to the warrant, searched Room 216, where he discovered further evidence of Jeffus' prior presence and cocaine residue.

Jeffus contends that he was improperly denied a hearing under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (articulating the circumstances when the affidavit supporting a facially valid warrant may be challenged), to question the veracity of the information contained in the affidavit provided by the informant, which supported the issuance of the warrant. In addition, Jeffus contends that the district court improperly denied him a continuance at the suppression hearing for which Jeffus had been unable, despite the exercise of due diligence, to locate and obtain the testimony of two witnesses who allegedly could challenge the informant's veracity. Jeffus contends that the witnesses were necessary for him "to establish that [Detective] Lamb's affidavit in support of the search warrant contained false information in that it did not faithfully report the statements of the informants to Lamb."

In *Franks*, the Supreme Court defined the limited circumstances under which a defendant can successfully attack a facially sufficient warrant. The test requires that a defendant (1) "make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and (2) that the statement was necessary to the finding of probable cause. 438 U.S. at 171–72, 98 S.Ct. at 2684–85. The defendant's burden is a heavy one, since ample mechanisms already exist in pretrial stages of the criminal process to protect innocent citizens' rights, such as the threshold requirement of probable cause for the issuance of a warrant, the magistrate judge's right to demand further evidence and to take testimony, the finding by a grand jury that a true bill should issue, as well as other preliminary procedures afforded before trial. With the defendant's burden in attack-

ing a search authorized by a facially valid warrant so heavy, so too is his burden in establishing the need for a hearing on the issue. The Court in *Franks* explained:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Id.* at 171, 98 S.Ct. at 2684.

■ In this case, Jeffus failed to meet any aspect of this heavy burden. Although his counsel alleged that two witnesses could help him attack the warrant affidavit, counsel was unable to interview the two witnesses to determine whether they had knowledge about the information provided to Detective Lamb. The most that Jeffus' counsel could say was that he had "an inconclusive [partially inaudible tape recorded] interview" with one of the witnesses in which there "seems to be some inconsistencies between what might be in the affidavit and what was in the tape recorded interview." Counsel for Jeffus candidly acknowledged, "Because we are unable to sort of complete this interview, to find out exactly whether it was consistent or inconsistent, it makes it difficult to proceed." The two witnesses that counsel had in mind were missing and could not be located either by Jeffus or by the government, despite the efforts of both parties. The fact therefore remained that at no time could Jeffus' counsel claim that any portion of Detective Lamb's affidavit was erroneous or false. Nor could the suggestion be made that purportedly false information from the informant was deliberately or recklessly included in the affidavit in

order to obtain the search warrant. In these circumstances, we conclude that Jeffus did not adequately demonstrate to the district court his entitlement to a *Franks* hearing and that the district court did not abuse its discretion in denying a continuance to give him additional time to find the witnesses.

### III

 Jeffus next contends that the search of his person incident to his arrest on February 8, 1992, violated his Fourth Amendment rights because the arrest was grounded on the same allegedly defective information provided to Detective Lamb and on information obtained from the allegedly illegal search of Room 216 at Travel Host Motel.

Jeffus was arrested and searched after he pulled up outside of Room 216 in a 1979 burgundy Pontiac Firebird. At that time, Detective Lamb had completed his search of the motel room and had information from his informant that drugs from Room 216 were being distributed by means of a burgundy Pontiac, that the occupants of Room 216 were linked to a 1979 Pontiac by means of the key tag found in the room's trash, and that Jeffus was part of the operation. As a result of the search, a "considerable amount" of cocaine was recovered from Jeffus' person.

Jeffus argues that to the extent that the confidential information relied on by Detective Lamb was deficient and the resulting search of Room 216 improper, the search of his person must likewise be found to be illegal as the fruit of the earlier illegal search. His argument, however, fails to account for the independent evidence obtained from the trash bag. In addition, we found no basis to question the information used by Detective Lamb in obtaining the warrant to search Room 216, and no one contends that the warrant authorizing the search of Room 216 was facially improper. Therefore, we reject Jeffus' argument.

### IV

Finally, Jeffus contends that a search of his jail cell, while he was being detained pending trial, was illegal. He argues that the search was conducted to obtain his personal papers as evidence against him and had "nothing whatever to do with security, safety, or sanitation" at the jail. *See Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200–01, 82 L.Ed.2d 393 (1984) (holding that a convicted prisoner did not have a legitimate expectation of privacy in his prison cell because of institutional needs of the prison such as security, safety, and sanitation).

On June 12, 1992, while Jeffus was being detained before trial, a search warrant was obtained to search Jeffus' jail cell, based on information received from two jailhouse informants. The search produced incriminating letters between Jeffus and various co-conspirators. On Jeffus' motion to suppress this evidence, the district court ruled, without referring to the warrant, that on the basis of *Hudson,* Jeffus did not have an expectation of privacy in his jail cell. Jeffus urges us to reject the rationale of the district court and remand the case for a ruling on the appropriateness of the warrant. We refuse to do so.

We have held that "with the person's loss of liberty upon arrest comes the loss of at least some, if not all, rights to personal privacy otherwise protected by the Fourth Amendment," including a right of privacy from routine searches of the person's jail cell. *Jones v. Murray,* 962 F.2d 302, 306 (4th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 472, 121 L.Ed.2d 378 (1992); *cf. United States v. McKinnon,* 985 F.2d 525, 527 (11th Cir.) (holding that a person lawfully arrested has no expectation of privacy in the back seat of a police car, analogizing the back seat to a jail cell), *cert. denied,* — U.S. ——, 114 S.Ct. 130, 126 L.Ed.2d 94 (1993). This is because inherent in imprisonment is the loss of freedom of movement, choice and privacy. *See Bell v. Wolfish,* 441 U.S. 520, 537, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979). Accordingly, we conclude that the district court's rationale was amply supported.

For the reasons given, we affirm the judgment of the district court.

*AFFIRMED.*