**UNITED STATES of America**

v.

**Tysheem PORE**

**No. CRIM.L–03–0414.**

United States District Court,
D. Maryland.

Aug. 5, 2004.

Joseph A. Balter, Office of the Federal Public Defender, Kenneth W. Ravenell, Schulman Treem Kaminkow Gilden and Ravenell PA, Baltimore, MD, for Defendant.

Harry Mason Gruber, Office of the United States Attorney, Thomas M. DiBiagio, Baltimore, MD, for Plaintiff.

## *MEMORANDUM*

LEGG, Chief Judge.

On August 2, 2004, the Court issued a brief Order denying Defendant Tysheem Pore's ("Pore") Motion to Suppress Evidence. The Court now writes to further explain its ruling.

## I. BACKGROUND

This case involves a thirteen-minute traffic stop on Route 95 in Cecil County, Maryland. On August 25, 2003, Trooper Howard Kennard ("Kennard") of the Maryland State Police observed Pore make an unsafe lane change, among other traffic violations. When Kennard activated his siren, the video camera mounted to his patrol car automatically began recording.[1]

Pore's minivan stopped on the right hand shoulder of the highway and Kennard parked behind it. Kennard walked up to the passenger's side of the van and informed Pore that he had been driving unsafely. In a courteous tone, Kennard asked Pore for his driver's license and vehicle registration. As Pore, who was

---

1. There is a videotape record of the encounter, with audio provided by a microphone attached to Kennard's belt. The audio recording, however, ceased after Kennard's initial conversation with Pore. At the hearing, Kennard explained that when he returned to his vehicle and sat down, he must have accidentally turned off the microphone.

highly nervous, struggled to retrieve his Virginia driver's license from his wallet, Kennard noticed a New York license. He asked Pore for that document as well. As he spoke with Pore, Kennard smelled a strong odor of air freshener coming from inside Pore's van.

Kennard returned to his patrol car and began "calling in" Pore's information. His suspicions raised, Kennard requested a K–9 unit to perform a drug scan. Sergeant Michael Lewis ("Lewis") of the Maryland State Police, who was Kennard's supervisor, overheard the call. Because he was nearby, Lewis decided to provide assistance. The videotape shows Lewis briefly speaking with Pore.[2] While Kennard was completing his check on Pore's documents, Trooper George Butler of the Maryland State Police arrived with Lobo, a certified drug-detection dog. Without speaking to Butler, Kennard gestured with his hand, signaling Butler to conduct a scan. Lobo alerted twice, at the rear end and at the front passenger side of the van.

The Maryland State Police officers found cocaine, crack cocaine, heroin, and a handgun in a secret compartment in Pore's car. Pore moved to suppress the evidence. On July 9, 2004, the Court held an evidentiary hearing. Because of the unavailability of witnesses, the hearing was continued to July 27th and 29th, with oral argument on the 30th During the hearing, the Government called the following witnesses:

(i) Kennard, who was also the arresting officer;

(ii) Lewis, who has considerable knowledge and training in drug transpor-

tation, traffic stops, and secret compartments; and

(iii) Butler, who, at the time of the stop, had trained and worked with Lobo for approximately one year.

Pore did not testify, but he called a Maryland State Police K–9 officer, Trooper Colleen McCurdy. Pore also introduced into evidence several factual stipulations and a number of other exhibits.

## II. ANALYSIS

There are two issues: (i) whether Trooper Kennard had reasonable articulable suspicion to stop Pore; and (ii) whether there was probable cause to search Pore's van.

 The Court finds that Kennard validly stopped Pore for traffic violations, including speeding, following too closely, and an unsafe lane change. Once Pore had pulled to the side of the road, Kennard had a reasonable length of time in which to conduct a routine traffic stop. *See United States v. Rusher*, 966 F.2d 868, 876 (4th Cir.1992) (finding that requesting a driver's license and vehicle registration, running a computer check, and issuing a citation falls within the proper investigative scope of a routine traffic stop).

 Kennard was in the process of calling in Pore's Virginia driver's license and New York license (which was, in fact, a suspended learner's permit), when his observations established probable cause to conduct a search of Pore's van for drugs.[3] Pore was highly nervous. He was breathing heavily and his muscles were tense.

---

**2.** There is no audio recording of Lewis's conversation with Pore because the microphone attached to Lewis's belt did not transmit to Kennard's patrol car video system.

**3.** Pore argues that Kennard caused an unnecessary delay in checking Pore's information, resulting in an impermissible second stop. The Court disagrees. Kennard testified that

regulations required him to document all traffic stops by either issuing a warning or a citation. At the time he decided to search Pore's car, Kennard was in the process of writing and issuing a warning to Pore for unsafe driving. The search and arrest occurred within the time frame of a routine

Because Pore's hands were shaking badly, Pore used his teeth to extract his license from a plastic sleeve in his wallet.[4] Kennard's observations were corroborated by Lewis, who testified that Pore's chest was palpitating and his right carotid artery was visibly pulsating. Kennard testimony that he smelled the strong odor of air freshener is corroborated by pictures showing pine tree shaped air fresheners hanging from the rear view mirror of Pore's van.[5] Lewis also testified that he smelled a strong air freshener odor when he spoke with Pore.

After Kennard called for a K–9 scan, Trooper Butler and Lobo promptly arrived.[6] Butler testified that the dog alerted, and the tape shows Butler rewarding Lobo by throwing Lobo his toy, rubbing Lobo's ears and head, and praising the dog. The defense mounted a spirited attack on the probative value of Lobo's alert. Pore challenged the reliability of drug sniffing dogs in general and Lobo in particular, and sought to discredit Butler's testimony that Lobo had, in fact, alerted.

While resourceful, this attack is unavailing. Lobo is a certified and well-trained K–9 capable of detecting even a faint odor of drugs. An alert does not necessarily mean that drugs are present in a car, the dog will alert to the residual odor that remains for a time after drugs have been removed.[7] An alert is, nonetheless, a significant factor in the probable cause equation.

Lobo's scan of the car and his alert are not plain to see from the video tape. The camera's view of Lobo was partially obscured by the front of the patrol car. The defense interprets the tape as showing that Butler either mistook Lobo's equivocal behavior as an alert, or that Butler fabricated an alert as a pretext for searching Pore's car.

The Court rejects these contentions. At the time of the instant scan, Butler and Lobo were an established team, and they had trained and worked together for a year.[8] Butler sent Lobo around the car

---

traffic stop, so this case does not involve a "second stop" problem.

4. As the videotape demonstrates, Kennard was friendly and non-confrontational when he spoke to Pore. Kennard is also heard commenting on Pore's difficulty in extracting his license from his wallet.

5. Drug couriers use air freshener and other chemical odors in an effort to throw off the drug dogs. The defense disputes the strength of the odor but does not deny the presence of the air freshener.

6. Pore does not, nor could he, argue that the canine scan amounts a search. *United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir.1994) ("Having the trained dog sniff the perimeter of [defendant's] vehicle, which had been lawfully stopped in a public place, [does] not of itself constitute a search.").

7. During oral argument, defense counsel suggested that evidence shows narcotics were found only half the number of times Lobo alerted during a one year period. Over the

government's objection, defense counsel introduced a binder containing field reports on Lobo's scans. (Def.Exs.6–8.) There was no testimony concerning these reports, and no explanation as to how they should be read or interpreted. The reports, therefore, have scant evidentiary value, particularly when a trained dog's sense of smell is powerful enough to detect a lingering odor of narcotics, even when the drugs are gone or there is no visible residue.

8. During this period, Butler and Lobo worked together on roughly a hundred drug scans. The Court credits Butler's testimony regarding their close relationship and Lobo's reliability. In its Order dated August 2, 2004, the Court stated that Butler and Lobo had worked together for four years, which is incorrect. Rather, Butler had been on the police force for over four years at the time of the search. This error, however, has no bearing on the Court's finding that Butler is sufficiently familiar with Lobo to recognize when his dog detects drugs.

twice to give Lobo an opportunity to make a careful observation. It is improbable that Butler would misinterpret Lobo's behavior.

Butler also lavishly praised and rewarded Lobo for alerting. It is unlikely that Butler would have been willing to subvert Lobo's training and performance by rewarding him when no reward was due. It is also unlikely that Butler would have been willing to confuse Lobo in order to search a car that, the dog, despite his powerful sense of smell, had given a clean bill of health.[9]

■ In deciding suppression motions, a Court must look at the facts as they existed before the drugs were discovered. The subsequent discovery of drugs does not validate a law enforcement officer's mere hunch. In this case, however, the quantity of drugs found in the car corroborates Butler's testimony that Lobo did, in fact, alert. In the same vein, a witness's testimony that he smelled smoke is corroborated by evidence of fire.

■ Law enforcement authorities know that Route 95 is a major artery for smuggling drugs up and down the east coast. State Troopers responsible for attempting to stem this flow are not permitted under our Constitution to stop and search cars randomly or on the basis of a hunch. The courts have, however, recognized that certain indicators may, when interpreted together, establish probable cause to justify a search or an arrest.[10] In this case, Pore's extreme nervousness, the strong odor of air freshener, and Lobo's alert[11] more than meet the constitutional threshold to justify a search.[12] Accordingly, the Court DENIED Pore's motion.

---

**9.** There was no communication between the two troopers beyond Kennard's hand gesture requesting Butler to conduct a drug scan. Butler's lack of information about Kennard's suspicions undercuts the defense's theory that Butler would have been motivated to fabricate a reason to search Pore's car.

**10.** See e.g., *United States v. Sullivan*, 625 F.2d 9, 10–13 (4th Cir.1980) (The dog's reaction to a bag later found to contain narcotics "provided sufficient probable cause, particularly when coupled with the other facts," such as nervousness.); *United States v. Singh*, 363 F.3d 347, 357 (4th Cir.2004) (finding that officer's observation that defendant was "visibly nervous and agitated" was a factor in the probable cause calculation).

**11.** Even if all the other factors were absent, Lobo's alert provided probable cause to search Pore's vehicle. *United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir.1994) ("When the dog 'alerted positive' for the presence of drugs, the officer was given probable cause

for the search that followed."); *United States v. McFarley*, 991 F.2d, 1188 (4th Cir.1993) (finding probable cause at the time the dog alerted).

**12.** One Kennard realized that Lobo had alerted, he began his search of Pore's van by opening the light gate. Almost simultaneously and before Kennard had located the secret compartment, Lewis got down on his hands and knees to inspect the van's undercarriage. Lewis immediately recognized the distinctive outline of a secret compartment. Lewis called the compartment to Kennard's attention. After looking himself, Kennard placed Pore under arrest.

Pore concedes that the outline was in plain view. He argues that the outline cannot furnish probable cause because it did not come into view until after the search had begun. The Court need not decide this issue because the other factors taken together provided Kennard with ample probable cause to search Pore's van.