**UNITED STATES of America**

v.

**Gregory Khair BROOKS, Defendant.**

**Criminal Action No. 2:08cr144.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Nov. 25, 2008.

Elizabeth Bartlett Fitzwater, United States Attorney's Office, Norfolk, VA, for Plaintiff.

Richard J. Colgan, Office of the Federal Public Defender, Norfolk, VA, for Defendant.

### OPINION AND ORDER

MARK S. DAVIS, District Judge.

This matter is before the Court on a motion to suppress evidence filed by Defendant Gregory Khair Brooks ("Defendant" or "Brooks"). Defendant's motion alleges that his constitutional rights were violated for the following reasons: (1) during a traffic stop he was illegally detained longer than necessary so that the police could bring in a drug dog to sniff his car for drugs; (2) the drug dog did not "alert" on Defendant's vehicle; (3) even if the drug dog did "alert," the drug dog was not reliable because no drugs were found; and (4) Defendant was questioned before he was advised of his *Miranda* rights. After briefing by the parties, a hearing on Defendant's motion to suppress was conducted on November 12 and 13, 2008. The matter is now ripe for decision, and for the reasons set forth in detail below, the Court **DENIES** Defendant's motion to suppress.

### I. Factual & Procedural History

On September 3, 2008, Defendant was indicted for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). On September 23, 2008, Defendant filed the instant motion to suppress, and on October 1, 2008, the government filed a response. Defendant then filed a motion to compel, requesting that the Court set a deadline for the production of information regarding the training and experience of the drug dog used to sniff his vehicle. The Court granted Defen-

dant's request and scheduled a hearing on the instant motion.

### A. Video of the Traffic Stop, Dog Sniff, and Search of Defendant's Vehicle

Virginia State Trooper Christopher Murphy testified that he was in Portsmouth, Virginia on July 19, 2008, as part of a joint crime-fighting operation between the Virginia State Police and the Portsmouth Police Department. On that morning, Trooper Murphy was in a police vehicle with Portsmouth Police Officer Christopher Clinton when, at approximately 9:42 a.m., they observed Defendant operating a vehicle with suspected illegally tinted windows. After stopping the Defendant's vehicle, they determined that Defendant was the driver and sole occupant of the vehicle and that the vehicle's front driver's side window was tinted darker than permitted by Virginia law.[1] A video of the vehicle stop was recorded from a camera mounted in Trooper Murphy's vehicle and was played at the suppression hearing.

During the suppression hearing, Trooper Murphy narrated the video recorded from his police vehicle during the Defendant's stop. The video contained a timestamp in the upper right corner, and Trooper Murphy testified that the accuracy of the camera's clock was confirmed each day. He further explained that the camera automatically activates when the vehicle's emergency lights are illuminated, though there is a short delay before the audio becomes operative.

As reflected by the video and Trooper Murphy's testimony, at 9:43 a.m., Trooper Murphy approached the driver's side of Defendant's vehicle and obtained Defendant's license and registration. At 9:43:44,

---

**1.** Trooper Murphy explained that, in Virginia, window tint on the front side-windows must allow at least 50% of light to pass through the window and that a test of Defendant's front driver's side window revealed that only 43% of light could pass through the window.

Portsmouth Officer Clinton began speaking with Defendant while Trooper Murphy transmitted Defendant's license and registration information through the police computer in his vehicle. At 9:44:52, Trooper Murphy called Virginia State Trooper Steve Homiak, who was located a few blocks away, and requested that he come to the scene with his drug detector dog.[2]

At 9:47 a.m., Trooper Murphy re-approached the driver's side of Defendant's vehicle and advised Defendant that he did not plan to issue a ticket for the excessive window tint, but that another Trooper had arrived and was going to "run" the Defendant's vehicle with a drug sniffing dog.[3] At 9:48:13, Trooper Homiak began his run around the perimeter of Defendant's vehicle with his drug dog, Debo. The dog run consisted of two passes, first a "working pass" and then a "detail pass." Although portions of Debo's drug sniff were captured on the video, Trooper Murphy explained that, due to a parking position utilized by police as a safety measure, the passenger side of Defendant's vehicle was not viewable on the video.

Trooper Homiak testified that, on the working pass Debo "alerted" at the B-post between the front passenger and rear passenger doors by giving a sharp head turn. Debo then moved back and forth in that general area and then left the area of his own volition. On the second pass, Debo again alerted at the B-post on the passenger side and then scratched near the passenger door. At that point, Trooper Homiak praised Debo and placed him back in his vehicle.

At 9:48:50 a.m., after the drug sniff had started, Trooper Murphy received the re-

sults of Defendant's license and registration check through his vehicle computer. At 9:49:33 a.m., Officer Clinton asked Trooper Murphy if Trooper Homiak's dog had "hit" on anything, and Trooper Murphy told him that he did not know—Trooper Murphy testified that he was not watching the dog sniff as he was attending to other matters. At 9:50:17 a.m., Trooper Homiak advised Trooper Murphy that Debo had "alerted" on the passenger side of Defendant's vehicle. At 9:52 a.m., Trooper Murphy returned to Defendant's vehicle and told him that the dog had altered on the car. At that point, Defendant began to question Trooper Murphy about the use of the drug dog as well as challenge the fact that the dog had not barked. Trooper Murphy explained that the police had the right to conduct such a sniff, provided Defendant with the name of a United States Supreme Court case so holding, and explained that Virginia State Police drug dogs do not bark when they "alert." At 9:53:26 a.m., Defendant was taken out of the vehicle and asked to stand with Portsmouth Police officers while a search of his vehicle was conducted by Trooper Murphy, Trooper Homiak, and Officer Clinton. At 9:59:59 a.m., Trooper Homiak called Trooper Murphy to the passenger side of Defendant's vehicle and handed Trooper Murphy a firearm discovered in the vehicle. Because his status as a convicted felon made it unlawful for him to possess a firearm, Defendant was then placed in handcuffs and taken into custody.

### B. Drug Detection Training and Certification of Debo and Trooper Homiak

Virginia State Trooper Michael Walter is a trainer at the Virginia State Police

---

**2.** Trooper Murphy had his own drug detector dog in the back of his vehicle, but he testified that Trooper Homiak was called in because a dog sniff is generally perceived as being more

objective if it is performed by an officer that has not yet had any contact with the suspect.

**3.** Officer Clinton ultimately issued a summons to Defendant for the illegal tint.

training academy in Richmond, where he teaches drug detection to dogs and dog handlers. He testified that he has trained approximately 95 dogs and handlers so far, is a certified canine trainer, and has worked with numerous federal and local jurisdictions on canine training. He was accepted by the Court, without objection, as an expert in "detector canines and canine handling." Similarly, Virginia State Senior Trooper M.C. Brown, a canine trainer at the Virginia State Police training academy since 2006, was also accepted, without objection, as an expert in narcotics detector canines and detector handlers.

Trooper Homiak and Debo, a three year old German Shephard, began their drug detection training at the Virginia State Police academy in early 2007, and both were "green" at the start of training, meaning that neither had previously been involved with drug detection. Trooper Walter was a trainer-in-training during such course and Trooper Brown ran the training course. The training course completed by Debo and Trooper Homiak was a 13 week, 520 hour, canine and canine handler drug detector course. After the course, Debo passed a certification test before going on the street with Trooper Homiak. In order to keep such certification current, the team must complete four hours of field training every week, as well as three full days (480 minutes each day) of training at the training academy each month under the supervision of a certified trainer. Both Trooper Walter and Trooper Brown testified that Debo is a strong drug detector and that Trooper Homiak and Debo are a good detector team.

Trooper Walter explained at the hearing that a detector dog's "alert" is an abnormal reaction to a trained stimulus—here the odor of certain narcotics. Although the odor of specific drugs can be trained and imprinted on a dog,[4] the "alert" is a natural reaction that cannot be trained. Debo alerts in the same way as a majority of dogs, with a "nice sharp head turn."[5] Virginia State Police detector dogs are also trained to give a "response" following an alert, and, unlike the alert, the response is a trained reaction. Trooper Walter indicated that detector dogs are trained to give either a passive response, where they sit, or an aggressive response, where they scratch and bite. Testimony indicated that a response is trained both to increase the dog's drive and to pinpoint items, and that the response signifies the dog wanting the toy used to motivate the dog during training. Trooper Homiak and both government experts indicated that the natural "alert," and not the subsequent trained response, is what gives the police probable cause to conduct a search.

As part of Debo's detection training he was trained to provide an aggressive response, which on vehicles he would do by scratching. During training and certification, Debo was taken through exercises where drugs were present as well as exercises with "blanks," which are known training solutions with no narcotic odors. Trooper Homiak as well as Troopers Walter and Brown testified that Debo has *never* falsely altered to a blank during training, although Debo has failed to alert during training where narcotics were present.

Trooper Brown testified that only six of the twelve teams that started the spring 2007 training program successfully completed the training and certification process and that Debo ranked in the top two

4. Debo is trained to detect cocaine, heroin, hashish, marijuana, methamphetamine and ecstasy.

5. Debo's alert can also be some other abnormal reaction, such as crawling under a vehicle or sticking his head up in the wheel well of a vehicle.

of the six dogs that completed the program. Trooper Brown indicated that Debo's alert is a *strong* head turn because "he's so fast," and that Debo is a highly motivated and "very reliable" drug detection dog. Furthermore, Trooper Brown testified that he has supervised Trooper Homiak and Debo more than any other trainer and that Trooper Homiak could read Debo's alerts and responses "very well."[6]

Officer Homiak and Debo were certified by Trooper Walter on June 11, 2007, and he recertified them on January 22, 2008. To obtain certification, a 6.0 is the minimum passing score; Debo received one 8.5, six 8.0s, and three 7.5s on his initial certification. On the January 2008 re-certification, Debo received two 8.5s, eight 8.0s, and two 6.5s. Trooper Walter offered the opinion that Debo and Trooper Homiak were "very reliable" in detecting drugs.

When asked about positive alerts in the field that fail to lead to the discovery of drugs, Trooper Walter explained that this may occur when drugs were previously present and the odor remained after the drugs were removed. He indicated that the Virginia State Police does not certify with such residual odor scenarios, but that they do train with such residual odors. He also explained that recently he had used food, tobacco, clothing, and many other items with Debo in follow-up training to see if he would give false alerts, but that Debo never falsely alerted.

The Defendant put on one expert witness, Steven Douglas Nicely ("Nicely"). Nicely testified that he had been a profes-

sional dog trainer since 1973, that he completed a Department of Defense dog school, worked as a dog handler for many years, worked with patrol dogs in a Texas Sherriff's office, and was later hired by Global Training Academy to train law enforcement dogs for drug detection, among other things. He also worked in Iraq as one of four trainers for the embassy security force for 80 dogs under the auspices of the U.S. Department of State and has trained approximately 100 dog teams from green dogs to completion through a twelve week course. Nicely has also written several articles on dog training, testified as an expert in state and federal courts approximately thirty times, and ran seminars on drug dog handling. Although the government asked Nicely several questions about his prior opinions and the amount of money he was being paid to testify, no objection was made and he was admitted as an expert in "detector dog behavior, training, certification, reliability, handling, and handler behavior."

Notwithstanding his certification as an expert, Nicely acknowledged that his views are not in line with the bulk of the detection dog training world. Accordingly, Nicely believes that many state and federal agencies, including the Virginia State Police and U.S. Border Patrol, do not employ sufficiently stringent certification standards and that Debo, along with every other dog certified by the Virginia State Police, is not properly certified. Nicely contended that the reason his views were different from the detector dog community as a whole is because others improperly

6. During the direct testimony and cross-examination of Trooper Homiak and the government's experts, it was highlighted that Trooper Homiak failed to conduct certain "pre-sniff" acts discussed in the training manual used by the Virginia State Police, such as removing occupants from the vehicle, turning off the vehicle, closing all windows, and turning on the vehicle's air circulation. After considering the exhibits and testimony before the Court, the Court finds that the defense failed to establish that any of the actions taken, or not taken, by Trooper Homiak undermined the reliability of Debo's alert and positive response.

fail to place enough emphasis on behavioral science.

Nicely criticized Debo's certification because he does not believe that sufficient information is reflected on the certification document itself. He said that the document purports to measure whether the dog will respond to the odor of drugs, but it does accurately measure that since one cannot determine from the document whether the dog is responding to drugs or "novel stimuli." For example, Nicely would have recorded on the certification document when the drug was placed at the location before the test, when the dog encountered the item, how long it took for him to alert, the height of the item, and whether it was found on the first attempt, among other things.[7] Nicely also suggested that testing a dog on "blanks" does not adequately test for novel stimuli because it does not reflect variables like "handler cues" or "reinforcement." While he admitted that there had been government testimony about Debo being tested with food, clothing, tobacco, etc., he said that the certification and training documents for Debo do not show testing for all of these variables and the documents are therefore deficient. Nicely also challenged the internal validity of the certification records as without more detail they could not be repeated and confirmed. Although it was clear from his testimony that, in Nicely's opinion, the Virginia State Police fail to adequately *document* their certification testing procedures, he failed to offer convincing testimony indicating that the actual testing procedures utilized for Debo's training or certification were unreliable.[8]

Nicely's testimony relied in part on a 1995 U.S. Department of Justice report reflecting suggestions for the training and handling of drug dogs, indicating that record keeping should be thorough and that agencies should carefully consider whether to self-certify their dogs. However, Nicely conceded that the report contained a disclaimer that it was not a rigid training document and there might be other methods of training/testing. While he admitted that his only exposure to Debo was through the training and certification documents provided by the government as well as Debo's brief appearance on the video shown in court, Nicely offered the opinion that Debo is not a well-trained detector dog because: (1) from day one, the training records reflect that Debo had problems with bad searching habits and "spontaneous recovery;" and (2) Debo had problems with stimulus discrimination in targeting drug odor versus other odorants.[9] However, he also admitted that

7. Nicely admitted that early in his career he would certify without including as much of this information as he now suggests should be included.

8. The defense repeatedly attempted to rely on "Narcotic Canine Utilization Reports" which, according to the defense, reflected the accuracy of the "real life" searches conducted by Debo in the field. The testimony before the Court, however, indicated that such reports do not always record whether a small amount of drugs were found after an alert, but instead only reflect whether drugs were actually seized, and thus, such reports cannot be relied upon to establish a percentage of "successful" field sniffs. The field reports are therefore insufficient to establish unreliability, especially in light of the evidence indicating that Debo never once alerted on a "blank" during his extensive training and certification. Furthermore, even if the field reports had accurately recorded every instance of drugs being found (or not found) after a real life alert by Debo, that would still not measure Debo's accuracy because it would not account for residual drug odors on which Debo alerted when drugs were no longer physically present.

9. Part of Debo's training utilized "psuedo" which is a synthetic material designed to mimic the odor of certain illegal narcotics. Nicely agreed with the conclusion in the 1995 Department of Justice document that using pseudo is not an appropriate training method.

these problems were reflected early in Debo's initial training period and that his (Nicely's) opinions conflicted with Trooper Walter's opinions.

Nicely also testified that the video of Debo's sweep reflected the handler pulling on the dog and the dog presenting numerous times, calling Debo's reliability into question. Nicely likewise took issue not only with the technique utilized in this specific sweep but challenged the use of a "detail pass" in any scenario as he contends that detection dogs are improperly cued during detail passes. Nicely also opined that the video reflected wind direction that would not bring the air current to Debo at the location of the purported alert, though he admitted that Debo's sweep occurred several minutes prior to the slight breeze depicted in the video.

On cross examination, Nicely acknowledged that although some courts have agreed with his expert opinions, others have not. Nicely also indicated that he has only been retained as a defense expert and that certain agencies, such as the Border Patrol, would likely refuse to work with him. The government questioned Nicely regarding an alleged bias against law enforcement agencies but he denied that such bias existed, notwithstanding his past comments regarding the competency of certain officers.

### C. Miranda Warnings

Portsmouth Police Officer Clinton was with Trooper Murphy on July 19, 2008, during the traffic stop which led to the discovery of the firearm in Defendant's vehicle. After Defendant was taken into custody because it was determined that he was a convicted felon who should not be in possession of a firearm, Officer Clinton met with Defendant the same day around 10:30 a.m. in a holding cell at the Portsmouth police headquarters—no one else was present during his meeting with Defendant. Officer Clinton read Defendant his *Miranda* rights from a preprinted card that was admitted into evidence. Defendant responded after each line of the rights, indicating that he understood the right. While he would have normally had Defendant sign a written waiver form, there were no forms available, so Officer Clinton did not have Defendant sign a form. After having been read his rights, Defendant agreed to answer Officer Clinton's questions. In response to those questions, Defendant stated that he had the gun for protection because he "used to sling back in the day and people could still have beef."

### II. Discussion

Defendant's motion to suppress alleges that his Fourth Amendment rights were violated in four ways. First, he claims that the initial stop should have been terminated before the drug-sniff was conducted. Second, he claims that the drug dog did not alert on his vehicle. Third, he claims that even if the drug dog did alert, the drug dog was not reliable because he was improperly trained and certified. Fourth, he claims that any statements he made about the firearm found in the vehicle should be suppressed because he made the statements before he was read his *Miranda* rights. As the Court heard evidence at the suppression hearing, it became clear that Defendant was primarily focused on his third argument, regarding the reliability of the drug dog. However, because Defendant never affirmatively abandoned his other arguments, the Court addresses each of them below.

### A. Unlawful Detention

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV; *United States v. Farrior*, 535 F.3d 210, 217 (4th Cir.2008), *petition for cert. filed*, ——

U.S.L.W. —— (U.S. Nov. 3, 2008) (No. 08–7118). With limited exceptions, the Fourth Amendment's prohibition against "unreasonable searches and seizures" requires officials to obtain a warrant before searching persons or property. *United States v. Ushery*, 526 F.Supp.2d 497, 501 (M.D.Penn.2007); *see United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). While a traffic stop constitutes a seizure within the parameters of the Fourth Amendment despite its relatively limited duration, it is not necessary for a police officer to obtain a warrant before stopping a vehicle if the officer has probable cause to believe that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Furthermore, while probable cause is sufficient to justify a routine traffic stop, police may also stop a vehicle without violating the Fourth Amendment prohibition against unreasonable searches if they have "reasonable suspicion to believe that a traffic law has been broken." *United States v. Delfin–Colina*, 464 F.3d 392, 396 (3d Cir.2006).

Our Court of Appeals recently discussed the application of the reasonable suspicion standard in the context of a traffic stop followed by a drug dog sweep, stating:

Following the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "the law has become well-established that during a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation," *United States v. Rusher*, 966 F.2d 868, 876–77 (4th Cir.1992), without running afoul of the Fourth Amendment. Any further investigative detention, however, "is beyond the scope of the *Terry* stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime," *id.*, or the individual consents to the further detention, *United States v. Foreman*, 369 F.3d 776,

781 (4th Cir.2004). The Supreme Court has held that a drug-dog sniff is not a "search" as that term is used in the Fourth Amendment. *United States v. Place*, 462 U.S. 696, 706–07, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). In order to perform the sniff, however, "there must be a seizure of the vehicle and, therefore, the person, requiring either consent to be detained or reasonable suspicion." *Foreman*, 369 F.3d at 781.

*Farrior*, 535 F.3d at 217.

■■■ Whether the stop is based upon probable cause, or the less stringent *Terry* stop reasonable suspicion standard, a court looks to the totality of the circumstances in determining whether probable cause or reasonable suspicion exists for the stop. *See United States v. Williams*, 417 F.3d 373, 376 (3d Cir.2005). Applying these standards, an officer may stop a vehicle for a window tint violation if the tint is sufficiently dark that a reasonable officer would suspect that it violates applicable law. *Holeman v. City of New London*, 425 F.3d 184, 190 (2d Cir.2005) (finding that tinted windows alone would justify police officer's stop if window tint was so dark that officer, acting reasonably, would suspect there was a traffic violation).

■■ Here, the evidence before the Court establishes that Trooper Murphy and Officer Clinton had, at the very least, reasonable suspicion, to stop Defendant's vehicle. Trooper Murphy testified that during the daytime he saw Defendant's vehicle drive by with front side window tint and believed that it was too dark and therefore constituted a violation of Virginia's window tinting statute. Va.Code § 46.2–1052(C)(2) (providing that no tinting film may be applied to the front side-windows of any motor vehicle "that reduce total light transmittance of such window to less than 50 percent").

Once the vehicle was stopped, Trooper Murphy approached Defendant's vehicle and requested his license and registration. Defendant does not challenge the stop up to that point. He claims that the initial stop should have been terminated before the drug-sniff was conducted by the canine, and that this alleged unconstitutional detention precipitated the drug dog sniff that led to the recovery of the firearm. However, as the *Farrior* Court noted, the law is well-established that during such a routine traffic stop, an officer may request a driver's license and registration, run a computer check, and issue a citation. *Farrior*, 535 F.3d at 217. That is exactly what Trooper Murphy did. Even if Defendant was told that he was likely going to receive only a warning, Trooper Murphy was waiting for a response on the license and registration check before releasing Defendant. While he was awaiting a response, Trooper Homiak arrived, began a sweep of the vehicle at 9:48:13 a.m. with his drug dog Debo, and then placed Debo back in his police vehicle. At 9:48:50 a.m., Trooper Murphy received a response from the license and registration check indicating that there were no outstanding warrants. At 9:50:17 a.m., after having placed Debo back in his vehicle, Trooper Homiak notified Trooper Murphy that the dog had alerted. From the beginning of the traffic stop at 9:42 a.m., until the time that Trooper Homiak notified Trooper Murphy that the dog had alerted, was less than ten minutes.

Since Trooper Homiak had already conducted his sweep by the time Trooper Murphy received the license and registration confirmation, the detention of Defendant for the additional minute and twenty-seven seconds that it took for Trooper Homiak to advise Trooper Murphy of the alert does not suggest an intentional delay and is reasonable when one considers that Trooper Homiak was in plain view of Trooper Murphy and Homiak testified that he placed Debo back in his police vehicle before advising Murphy of the alert. In *Farrior*, an officer held the suspect's license and registration in order to write a warning ticket, while at the same time a drug dog arrived and conducted a sweep of the vehicle—alerting to drugs. The Court of Appeals said that the additional time that it took to write the warning ticket was "not unreasonable as a violation of his Fourth Amendment rights." *Farrior*, 535 F.3d at 220 (citing *Ingraham v. Wright*, 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) ("There is, of course, a de minimis level of imposition with which the Constitution is not concerned."), *and United States v. Alexander*, 448 F.3d 1014, 1017 (8th Cir.2006) ("[E]ven if a dog sniff is thirty seconds to two minutes over the line drawn at the end of a routine traffic stop, a two minute delay is a *de minimis* intrusion on the driver's personal liberty that does not violate the Fourth Amendment."), *cert. denied*, 549 U.S. 1118, 127 S.Ct. 929, 166 L.Ed.2d 715 (2007)).

The delay here was one minute and twenty-seven seconds and it was entirely reasonable in light of the fact that Trooper Homiak was placing Debo back in his police vehicle and proceeding back to Trooper Murphy's vehicle to notify him of the alert. There was no suggestion whatsoever at the suppression hearing of "subterfuge or stalling on the part of the officers" that would call the detention into question. *Id.* at 219. Therefore, the detention was reasonable and did not violate the Fourth Amendment.

### B. Drug Dog Alert

Defendant claims in his suppression motion that Debo did not alert on his vehicle. However, the uncontradicted testimony at the suppression hearing was that Debo did in fact alert. Furthermore, Trooper Murphy testified that Defendant questioned the dog's presence and alert at the scene,

and Trooper Murphy explained to Defendant that Virginia State Police dogs do not bark when they alert. Accordingly, there is no Fourth Amendment violation with respect to Debo's alert.

■ Once Debo alerted, assuming he was reliable, such alert was sufficient to provide probable cause to search the Defendant's vehicle. *Illinois v. Caballes*, 543 U.S. 405, 409, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (explaining that the "trial judge found that the dog sniff was sufficiently reliable to establish probable cause to conduct a full-blown search of the trunk"); *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) (indicating that police need not obtain a warrant to search a vehicle if "probable cause exists to believe it contains contraband"); *United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir.1994) ("When the dog 'alerted positive' for the presence of drugs, the officer was given probable cause for the search that followed."). The Court therefore turns its attention to Defendant's contention that Debo's alert was not reliable.

## C. Reliability of Drug Dog

Defendant claims that even if Debo did alert on his vehicle, the alert was not reliable because he was improperly trained and certified. The Court heard extensive testimony on this point from experts on both sides. The Fourth Circuit Court of Appeals recently addressed this very issue in an unpublished disposition that, while not binding on this Court, is persuasive. Therefore, the Court first examines that case.

In *United States v. Wu*, 217 Fed.Appx. 240 (4th Cir.2007), *cert. denied*, — U.S. ——, 127 S.Ct. 2929, 168 L.Ed.2d 257 (2007), the Fourth Circuit reviewed a deni-

al of a defendant's suppression motion. In *Wu*, police officers obtained a search warrant for the defendant's home based upon an affidavit describing a narcotics detection dog (Cody) alerting on two packages successively delivered to a UPS store less than two months apart. After the dog alerted to the first package, it was opened pursuant to a search warrant and stolen goods, but no drugs, were discovered inside. The affidavit in support of such warrant stated that: (1) the dog and his handler were a certified team in narcotics detection; (2) the dog and handler graduated from the state police detection school; (3) the dog and handler successfully completed 240 hours of instruction in which the dog sniffed various items and when the dog "has alerted to any of these items, narcotics have been present in the overwhelming majority of these cases"; and (4) the dog and handler completed one recertification session that was designed to update previous certifications and confirm narcotics detection ability. *Id.* at 241–42. Like the first package alert and search, after the drug detection dog alerted to the second package, a warrant was obtained, and stolen goods, but no drugs, were discovered inside.

Although the police officers in *Wu* did not find narcotics in either of the packages,[10] the contents ultimately led to convictions for credit card fraud and use of unauthorized credit cards. Wu filed a motion to suppress all evidence seized from the packages and his home, claiming that the government lacked probable cause for the searches because they had not demonstrated the dog's "reliability as a drug-detection dog." *Id.* at 243.

The Court of Appeals began its analysis by noting that probable cause under the

---

**10.** Wu admitted that he used controlled substances and that he had stored them in his vehicle and residence.

Fourth Amendment exists when, after considering the totality of the circumstances, there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 244 (quoting *United States v. Grubbs,* 547 U.S. 90, 95, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006)). Moreover, "[t]he probable cause standard does not demand any showing that such a belief be correct or more likely true than false." *Id.* (quoting *Simmons v. Poe,* 47 F.3d 1370, 1379 (4th Cir.1995)).

The Court of Appeals then observed that while it had previously held that a positive alert by a drug detection dog is generally sufficient to establish probable cause, implicit in such holdings "is the assumption that a drug dog's positive alert for contraband must possess some indicia of reliability for the alert to establish probable cause." *Wu,* 217 Fed.Appx. at 245. Noting that "sister circuits have held that a search warrant based on a positive alert by a drug dog is sufficient on its face to establish probable cause if the affidavit supporting the warrant states that the dog is trained and certified to detect controlled substances," *id.,* the Court of Appeals noted:

> Assuming that evidence of a drug dog's training and certification is needed to establish the dog's reliability, such evidence was clearly present in the instant case. Aside from providing accounts of Cody's positive alerts to the packages, the affidavits supporting both the May 9 and June 27 warrants described in some detail Cody's training and certification as a drug-detection dog, including describing how Trooper Barger and Cody had completed 240 hours of instruction from March 2004 through May 2004 and noting that Barger and Cody had completed one re-certification session on January 14, 2005 to "confirm narcotic detection ability."

We believe that this evidence of Cody's training and certification was enough by itself to establish Cody's reliability so that his positive alerts for controlled substances established probable cause for both the May 9 and June 27 searches. Probable cause only requires a 'fair probability' that contraband will be found in a certain place, [*Illinois v.*] *Gates,* 462 U.S. [213] at 238, 103 S.Ct. 2317 [76 L.Ed.2d 527 (1983)], and Cody's positive alerts to the packages in both searches clearly established a fair probability that the packages contained controlled substances, given his training and certification as a drug-detection dog. In addition to reviewing the evidence of Cody's training and certification, however, the district court also heard testimony from Trooper Barger, Cody's handler, about Cody's performance statistics and his field experience from March 2005 to May 2005. The district court found that Cody had demonstrated an impressive degree of accuracy in training exercises, and based on its review of Cody's past field sniffs, the court found that Cody was accurate approximately 67% of the time in the field when sniffing for narcotics. While we believe that this factual finding was unnecessary for the district court to have concluded that probable cause existed for the searches given the evidence of Cody's training and certification, it serves to bolster the court's determination that Cody was sufficiently reliable for his positive alerts to establish probable cause for the May 9 and June 27 searches. *See United States v. Robinson,* 390 F.3d 853, 874 (6th Cir.2004) ("[A]fter it is shown that the dog is certified, all other evidence relating to his accuracy goes only to the credibility of the testimony, not to the dog's qualifications." (internal quotations marks omitted)).

*Id.* at 245–46.

Wu argued that Cody was unreliable because he had alerted for the presence of

controlled substances when none were present. The Court of Appeals found that Cody's positive alert for controlled substances when none were found did "not undermine the entire body of his previous work." *Id.* at 246. The Court said:

That Cody positively alerted to the presence of controlled substances when none were found certainly is a factor to be considered under the totality of the circumstances in determining whether probable cause existed for the June 27 search, *see Robinson,* 390 F.3d at 874, but the reliability of a drug-detection dog does not rise or fall on the basis of one sniff. Cody had proven very accurate in sniffs during his training. Moreover, factoring the May 9 alert into the district court's original calculation of Cody's field accuracy rate, Cody would still have been "correct" six times and "incorrect" four times, rendering an accuracy rate of 60%. Because "the probable cause-standard does not require that the officer's belief be more likely true than false," [*United States v.*] *Humphries,* 372 F.3d [653] at 660 [ (4th Cir.2004) ], an accuracy rate of 60% is more than reliable enough for Cody's alert to have established probable cause. Thus, even without considering the information in the June 27 warrant affidavit concerning the stolen goods found during the May 9 search, probable cause existed for the June 27 search based on Cody's positive alert to the presence of controlled substances in the package. Under the totality of the circumstances, the officers' knowledge at the time of the June 27 search that the items seized in the May 9 search had been stolen only further solidified the probable cause finding.

*Id.* at 246–47.

█ Virtually the same can be said on the facts presently before this Court. Debo and Trooper Homiak were certified in June 2007 after completing a 13 week 520 hour training course at the police training academy, a course more than double the length of the training course involved in *Wu.* Thereafter, they completed three days per month of concentrated training (480 minutes each day) at the training academy in Richmond under the supervision of a certified trainer, plus four hours of training each week in the field. They were re-certified in January 2008. Trooper Homiak testified that Debo had never alerted on a blank. Trooper Walter, who observed Trooper Homiak and Debo in the 2007 training class and has since become a trainer, said that Debo and Trooper Homiak were a good team and are "very reliable." He had also recently used food, tobacco and other items in a training session with Debo, and Debo never gave a false alert in that session. Senior Trooper Brown, the trainer of Debo and Trooper Homiak at the 2007 certification training, testified that he supervised Debo and Trooper Homiak more than any other trainer, and he had never known Debo to alert on a blank. He said this makes Debo a "very reliable" dog, and that Trooper Homiak can determine Debo's alerts and responses "very well." Troopers Brown and Walter also explained why many of the training methods about which they were cross-examined were not desirable or necessary in their expert opinions.

Bearing in mind the standards set forth above, this Court concludes that, based upon the totality of the circumstances, the training and certification of Debo and Trooper Homiak was sufficient to establish Debo's reliability to provide probable cause to search after an alert. The fact that no drugs were found in Defendant's vehicle is a factor for the Court to consider, but it does not preclude a finding of probable cause in light of the testimony regarding Debo's reliability and the fact that drug dogs alert in the presence of an

odor—even if the controlled substance is no longer present at the site of the alert. Debo's initial training and certification, on-going training and re-certification, and experience in the field clearly establish that he is a reliable drug detection dog whose alert on Defendant's vehicle created probable cause. Accordingly, there was no Fourth Amendment violation with respect to Debo's alert and the subsequent search of Defendant's vehicle.

### D. *Miranda* Rights

Defendant also claims in his motion that any statements he made about the firearm should be suppressed because he made such statements before he was read his *Miranda* rights, which included his right to remain silent. However, at the suppression hearing, the un-rebutted testimony of Officer Clinton was that Defendant was read his *Miranda* rights from a pre-printed card prior to questioning and that he made incriminating statements after being informed of his rights.

A defendant may make a knowing and voluntary waiver of his *Miranda* rights. *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). To be valid, the waiver "need not be explicit, but may be inferred from all the circumstances." *United States v. Hicks,* 748 F.2d 854, 859 (4th Cir.1984). An implied waiver may be found where a defendant willingly answers questions after being advised of his rights. *United States v. Cardwell,* 433 F.3d 378, 389–90 (4th Cir.2005). Based upon Officer Clinton's testimony recited above, the United States carried its burden of proving by a preponderance of the evidence that Defendant voluntarily, knowingly, and intelligently waived his rights when he agreed to answer Officer Clinton's questions. *Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

### III. Conclusion

For the reasons discussed in detail above, Defendant's motion to suppress the firearm, and his statements, is **DENIED.**

The Clerk is **DIRECTED** to forward a copy of this Order to counsel for Defendant and to the Assistant United States Attorney.

**IT IS SO ORDERED.**